**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Brittany S. Scott (State Bar No. 327132)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ltfisher@bursor.com
        bscott@bursor.com

*Attorneys for Plaintiff*

*[Additional Counsel on Signature Page]*

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SIRREON GOODSON, individually and on behalf of all others similarly situated,<br><br>                              Plaintiff,<br><br>      v.<br><br>KENVUE BRANDS LLC,<br><br>                              Defendant. | Case No. 2:24-cv-03152-DC-JDP<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br><u>JURY TRIAL DEMANDED</u> |

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED
CASE NO. 2:24-CV-03152-DC-JDP

Plaintiff Sirreon Goodson ("Plaintiff") brings this action on behalf of himself and all others similarly situated against Kenvue Brands LLC ("Defendant") based on personal knowledge as to himself, the investigation of his counsel, and on information and belief as to all other matters.

## NATURE OF THE ACTION

1.     Millions of Americans dream of a better night's sleep.  According to the CDC, more than one third of American adults regularly don't get enough of it.

2.     The search for sleep has become a cultural obsession – fueling the rise of an entire industry.  The most profitable business in America's sleep industry?  Drugs.  In 2023, a survey of 2,005 adults in the United States conducted by the American Academy of Sleep Medicine found that 22 percent of participants reported using over-the-counter sleep-aids.

3.     The drug industry, by and large, markets over-the-counter sleep-aids as a harmless solution to a harmful problem.  After all, insufficient sleep is linked to depression, ADHD, obesity, type 2 diabetes, cardiovascular disease, cancer, depression, and Alzheimer disease.  Big pharmaceutical companies like Kenvue Brands LLC promise a solution to America's public health epidemic of sleeplessness in the form of sleep-aids.  But in doing so, they've created an epidemic of their own by way of diphenhydramine-based sleep-aids.

### Background and Pharmacology of Diphenhydramine

4.     The first antihistamine containing diphenhydramine, Benadryl, burst onto the market in 1946, when medications were not required to pass rigorous drug safety or efficacy testing.  It was marketed for allergy relief, but users quickly identified its sedating effects.  These effects are the result of Benadryl's active ingredient: diphenhydramine.

5.     Quick to capitalize on growing demand, Kenvue Brands LLC and others began producing similar products with diphenhydramine and repackaging them for sleep.  This is the case with Kenvue Brands LLC's Tylenol PM products (the "Product").  The Products containing Diphenhydramine HCL and prominently stating on the front of their label that they are "Non-habit forming." To say this strategy was successful would be an understatement.  Today, the over-the-counter sleep-aid market is a global juggernaut, reaping nearly $65 billion a year – a number which is only continuing to rise.

6.    Diphenhydramine is a first-generation antihistamine frequently used, among other uses, to treat insomnia.  The sedative effect is related to its easy penetration of the blood-brain barrier.  In the brain, diphenhydramine interferes with $H_1$ receptors, causing drowsiness and sedation.

7.    Because the chemical floods the brain in large quantities, users can quickly develop a tolerance.  Tolerance can develop in as little as 1–2 weeks, requiring users to take larger and larger doses for the same sedating effect, and causing dependency in users who find they need diphenhydramine to fall asleep.  The result is habitual use.

8.    Users of diphenhydramine products are often startled by how quickly tolerance slips into dependency, and how quickly dependency can slip into abuse.  For example, the abuse of Benadryl is well-documented by the medical and rehabilitation communities alike.  A quick Google search of "Benadryl" or "diphenhydramine addiction" yields hundreds of results pointing individuals toward rehabilitation programs designed to combat diphenhydramine dependency.

9.    Diphenhydramine elicits a cocaine-like pattern of stimulation of dopamine transmission that can lead to misuse of medications containing diphenhydramine.

10.    In short, users can become dependent on diphenhydramine if they take it continuously for a period of time and continuous use may cause it to stop working as well.

11.    There is a significant body of research on diphenhydramine addiction and misuse generally, as well as its use in Benadryl specifically.  The primary active ingredient in the Product is the same as the primary active ingredient in Benadryl that can lead to dependency: diphenhydramine.

12.    Consumers desire products that are safe and do not contain significant side effects.  They also prefer and desire sleep-aid products that do not cause habitual use.  Kenvue Brands LLC has capitalized on those consumer preferences by falsely promising that its Tylenol PM products are "non habit-forming."

13.    Sirreon Goodson relied on Kenvue Brands LLC's misrepresentations.  When Mr. Goodson purchased Kenvue Brands LLC's Tylenol PM, he saw it described as "non-habit forming" on the label and trusted those statements.  It mattered to him – as it does to millions of

consumers – that he could find the advertised benefits, relief, and support of a pain reliever and nighttime sleep-aid without developing a habit.  But he *did* develop a habit.

14.    Now, Mr. Goodson seeks relief on behalf of himself and countless consumers who have been cheated by Defendant's false and misleading statements.

**PARTIES**

15.    Plaintiff Sirreon Goodson is domiciled in California, residing in Sacramento, California.

16.    In or around November 2023, Plaintiff purchased the Product from a Walmart and Walgreens in Sacramento, California for his personal use.  Prior to his purchases, Plaintiff reviewed the accompanying labels and disclosures, including Defendant's representation that the Product was "non habit-forming."  Plaintiff understood the claims as warranties that the Product would provide the advertised benefits, relief, and support without causing habitual use or negative health outcomes.  Plaintiff relied on the claims in deciding to purchase the Product.  As such, the claims were part of the basis of the bargain, in that Plaintiff would not have purchased the Product on the same terms had he known that the claims were not true concerning the capability of the Product.  Indeed, when Plaintiff took the Product as directed by Defendant, he developed a habit, contrary to the "non habit-forming" claims.  Accordingly, Plaintiff did not receive the benefit of his bargain.  In making his purchase, Plaintiff paid a price premium due to Defendant's false and misleading claims.

17.    Plaintiff regularly goes to stores where the Product is sold.  Plaintiff would purchase the Product again if it was *actually* "non habit-forming" (*i.e.*, if the Product was sold as advertised).  However, if that change were made, Plaintiff would have no practical way to know if the product labeling was in fact true.  As a result, he may either refrain from purchasing the Product in the future or may purchase them incorrectly assuming that they have been improved and are truly non-habit-forming.  In short, Plaintiff is unable to rely on the labels in the future, and thus will not be able to purchase the Product.

18.    Defendant Kenvue Brands LLC is a New Jersey company with its headquarters and principal place of business in Summit, New Jersey.  Defendant maintains facilities in California

and throughout the United States.  At all relevant times, Defendant was engaged in manufacturing, marketing, distributing, and advertising its Product throughout the United States online and through brick-and-mortar retail stores.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 Class Members; the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs; and at least one Class member is a citizen of a state different from Defendant.

20.     This Court has personal jurisdiction over Defendant because Defendant regularly conducts business in this District and has extensive contacts with this forum.

21.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant transacts substantial business in this District.

## FACTUAL ALLEGATIONS

**A.     Defendant Misrepresents The Product as "Non Habit-Forming"**

22.     **Misrepresentation at issue:** Defendant falsely and misleadingly labels its Tylenol PM Extra Strength Pain Reliever, Nighttime Sleep Aid Diphenhydramine HCl Product, depicted below, as "non habit-forming."



23.     The "non habit-forming" claims on the Product's packaging are conspicuous and designed to grab the consumer's attention.  The Product prominently claims "non habit-forming" on the primary display panel of the front label or packaging underneath the Product's name and next to a short description of its usage.

24.     In this way, Defendant's carefully designed labels and packaging, including the placement of the claim, perpetuate the false notion that the Product *is* in fact "non habit-forming." Defendant intends that consumers viewing the Product's labels or packaging will read the claim, understand the claim, and rely on the claim.

**B.     The "Non Habit-Forming" Claim Is False**

25.     Diphenhydramine is associated with a large variety of adverse effects, including life-threatening toxicities.

26.     Effects for elder consumers can be particularly serious.  Hospitalized elderly people treated with diphenhydramine have an increased risk of delirium.  In adults 65 years and older, long-term, frequent use of first-generation antihistamines like diphenhydramine is associated with development of dementia and Alzheimer's due to their anticholinergic properties.

27.     Overdose, either accidental or intentional, can also lead to death due to antihistamines.  The presentation in adults is of sedation leading to a coma, and elderly adults are more sensitive to this toxicity.  Paradoxical stimulation with agitation and confusion is often the presenting sign in children, followed by extreme sedation and coma.

28.     According to the CDC, among 92,033 overdose deaths during 2019–2020, 13,574 (14.7%) were antihistamine-positive and 3,345 (3.6%) were antihistamine-involved.  Nearly all antihistamine-positive and -involved deaths (13,475, 99.6%; 3,339, 99.8%, respectively) included first-generation H1 antihistamines, primarily diphenhydramine (9,645, 71.1%; 2,226, 66.5%, respectively).  Among drug overdose deaths in 2017 that mentioned at least one specific drug on the death certificate, the ten drugs most frequently involved included fentanyl, heroin, cocaine, methamphetamine, alprazolam, oxycodone, morphine, methadone, hydrocodone, ***and diphenhydramine***.

29. Cardiac toxicity, because of prolonged QTc and arrhythmias, has also been reported with diphenhydramine.

30. The half-life of diphenhydramine can be as long as 18 hours. Next day "hang over effects" can occur including poor attention, reduced memory, poor sensory-motor performance, and reduced school performance for school-aged children. These hang-over effects can be dangerous. For example, in a simulation of 40 drivers, diphenhydramine resulted in the poorest driving performance – lower than that that of alcohol.

31. Because of this evidence, Canadian Society of Allergy and Clinical Immunology recommends that first-generation antihistamines such as diphenhydramine should be considered for availability only on a behind-the-counter basis. The Global Allergy and Asthma European Network also supports implementing a prescription requirement for first-generation antihistamines like diphenhydramine.

### *Defendant's Product Is Habit-Forming*

32. Although the Product is marketed as "non habit-forming," the Product's primary active ingredient, diphenhydramine, can cause habitual use.

33. Habitual use of diphenhydramine is both psychological and physical.

34. Diphenhydramine works by acting on certain receptors in the brain, causing sedation. Because of this, individuals can quickly develop a tolerance, requiring larger and larger doses for the same sedating effect, and finding that they are dependent on it to fall asleep. Tolerance can develop in as little as 1–2 weeks.

35. There is a substantial body of research that, individually and in the aggregate, demonstrates that diphenhydramine is habit-forming, or alternatively, is more likely than not to be habit-forming. The following is a non-exhaustive list of examples of such research:

- Schifano S, et al: Focus on Over-the-Counter Drugs' Misuse: A Systematic Review on Antihistamines, Cough Medicines, and Decongestants. Front Psychiatry, May 2021.

- Jagroop S, et al: Chronic Diphenhydramine Abuse and Withdrawal: A Diagnostic Challenge. Neurol Clin Pract, Oct 2017.

- Erbe S, Bschor T: [Diphenhydramine Addiction and Detoxification. A Systematic Review and Case Report] Article in German.  Psychiatr Prax, July 2013.

- Gracious B, et al: The Importance of Taking a History of Over-the-Counter Medication Use: a Brief Review and Case Illustration of "PRN" Antihistamine Dependence in a Hospitalized Adolescent.  J Child Adolesc Psychopharmacol, Dec 2010.

- Bonham C, Birkmayer F: Severe Diphenhydramine Dependence and Withdrawal: Case Report.  Journal of Dual Diagnosis, Vol 5, p 97-103, 2009.

- Thomas A, et al: Diphenhydramine Abuse and Detoxification: a Brief Review and Case Report.  J Psychopharmacol, Jan 2009.

- Herman DM, Bassetti CL: Reversible Opsoclonus after Diphenhydramine Misuse.  Eur Neurol 53(1):46-47, 2005.

- Richardson G, et al: Tolerance to Daytime Sedative Effects of H1 Antihistamines.  J Clin Psychopharmacol, Oct 2002.

- Cox D et al: Diphenhydramine Dependence. Addiction, March 2001, p 516-517.

- Roberts K, et al: Misuse of Diphenhydramine Soft Gel Capsules (Sleepia): a Cautionary Tale from Glasgow.  Addiction, Oct 1999.

- Dinndorf P, et al: Risk of Abuse of Diphenhydramine in Children and Adolescents with Chronic Illnesses.  J Pediatr, Aug 1998.

- De Nesnera AP: Diphenhydramine Dependence: a Need for Awareness. J Clin Psychiatry, March 1996.

- Feldman MD, Behar M: A Case of Massive Diphenhydramine Abuse and Withdrawal from Use of the Drug.  JAMA, June 1986.

**C.    Reasonable Consumers Were Misled By The "Non Habit-Forming" Claim**

36.    **Product at issue:**  Defendant manufactures, markets, promotes, advertises, labels, packages, and sells the Tylenol PM Product, which contains the "non habit-forming" claim on its packaging and labels and contains the ingredient diphenhydramine.

37.    **Relevant time period:**  All of the misrepresentations at issue here were uniformly and consistently made at all times during the last four years, at least.  There have been no material changes to the product packaging during the relevant period.

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    7
CASE NO. 2:24-CV-03152-DC-JDP

38.    **The claims:**  On the Product's labeling and packaging, Defendant prominently, conspicuously, and uniformly displays the words "non habit-forming."

39.    **Reasonable Consumer's perception:**  The "non habit-forming" claim leads reasonable consumers, like Plaintiff, into believing the Product is "non habit-forming."  More specifically, reasonable consumers interpret the "non habit-forming" claim to mean that the Product does not and cannot cause habitual use.

40.    Consumers' interpretation of the "non habit-forming" claim is not only consistent with the APA's definition and medical understanding of "habit"[1] but also with the ordinary and common usage of the term "habit":

> (a)    Cambridge Dictionary: "something that you do often and regularly, sometimes without knowing that you are doing it"; "a particular act or way of acting that you tend to do regularly"[2]

> (b)    Merriam-Webster: "a settled tendency or usual manner of behavior"; "an acquired mode of behavior that has become nearly or completely involuntary"; "a behavior pattern acquired by frequent repetition or physiologic exposure that shows itself in regularity or increased facility of performance"[3]

41.    **Materiality:**  The " "non habit-forming" claim was and is material to reasonable consumers, including Plaintiff, in deciding to buy the Product – meaning that the Product's "non habit-forming" attributes are important to consumers and motivate them to purchase the Product.

42.    **Reliance:**  The Class, including Plaintiff, reasonably relied on the "non habit-forming" claim in deciding to purchase the Product.

43.    **Falsity:**  The "non habit-forming" claim is false and deceptive because the Product poses a risk of habitual use.  Specifically, contrary to this claim, the Product promotes habitual use as a part of consumers' nightly routine and diphenhydramine, an ingredient used in the Product,

---

[1] APA Dictionary of Psychology, "Habit," https://dictionary.apa.org/habit ("*n.* a well-learned behavior or automatic sequence of behaviors that is relatively situation specific and over time has become motorically reflexive and independent of motivational or cognitive influence – that is, it is performed with little or no conscious intent.")

[2] Cambridge Dictionary, "Habit," https://dictionary.cambridge.org/dictionary/english/habit

[3] Merriam-Webster Dictionary, "Habit," https://www.merriam-webster.com/dictionary/habit

can also lead to frequent use over a prolonged period. Additionally, as a first-generation antihistamine, diphenhydramine poses a variety of safety risks as discussed herein.

44. **Consumers Lack Knowledge of Falsity:** Consumers, including Plaintiff, do not know and have no reason to know, at the time of purchase, that the "non habit-forming" claim was false, misleading, deceptive, and unlawful. That is because consumers, including Plaintiff, do not work for Defendant and the average reasonable consumer does not have the specialized knowledge of the chemicals and ingredient names and the properties of those ingredients used within the Product.

45. Reasonable consumers have no reason to independently check whether the Products are non-habit forming, because they reasonably assume that the packaging stating that the Products are non-habit forming is true.

46. There are no asterisks or other disclosures qualifying the misrepresentations at issue here, but even if there are, they are buried in fine print such that reasonable consumers are unlikely to see them at the time of purchase, if ever.

47. **Defendant's Knowledge**: Defendant knew, or should have known, that the "non habit-forming" claim was false, misleading, deceptive, and unlawful, at the time that Defendant manufactured, marketed, advertised, labeled, and sold the Product using the "non habit-forming" claim to Plaintiff and the Class. Defendant intentionally and deliberately used the "non habit-forming" claim to cause Plaintiff and similarly situated consumers to buy the Product believing that this claim was true.

(a) **Knowledge of Falsity**: Defendant named and marketed the Product with the "non habit-forming" claim, but Defendant opted to formulate and manufacture them in a manner that does not conform to the representation. Specifically, the Product poses a risk of causing habitual use and is not safe because it contains diphenhydramine.

(b) **Knowledge of Reasonable Consumers' Perception:** Defendant knew, or should have known, that the "non habit-forming" claim would lead reasonable consumers into believing that the Product was safe and would not result in habitual use based on internal conjoint and other marketing studies. Defendant labeled and packaged the Product with the "non habit-forming" claim based in part on its market research.

(c) **Knowledge of Materiality:** Defendant knew or should have known that the "non habit-forming" claim is material to consumers. First, manufacturers and marketers, like Defendant, generally reserve the front primary display panel of labels of packaging on consumer products for the most important and persuasive information, which they believe will motivate consumers to buy the products. Here, the conspicuousness of the "non habit-forming" claim on the Product's label and packaging demonstrates Defendant's awareness of its importance to consumers and Defendant's understanding that consumers prefer and are motivated to buy products that conform to the "non habit-forming" claim. Second, manufacturers and marketers repeat marketing claims to emphasize and characterize a brand or product line, shaping the consumers' expectations, because they believe those repeated messages will drive consumers to buy the Product. Here, the constant, unqualified use of the "non habit-forming" claim on the Product evidences Defendant's awareness that the falsely advertised Product-attribute is important to consumers. It also evidences Defendant's intent to convince consumers that the Product conforms to the "non habit-forming" claim and, ultimately, drive sales.

(d) **Defendant's Continued Deception, Despite Its Knowledge:** Defendant, as the manufacturer and marketer of the Product, had exclusive control over the "non habit-forming" claim's inclusion on the Product's label, packaging, and advertisements – *i.e.*, Defendant readily and easily could have stopped using the "non habit-forming" claim to sell the Product. However, despite Defendant's knowledge of the "non habit-forming" claim's falsity, and Defendant's knowledge that consumers reasonably rely on the "non habit-forming" claim in deciding to buy the Product, Defendant deliberately chose to market the Product with the "non habit-forming" claim thereby misleading consumers into buying or overpaying for the Product. Thus, Defendant knew, or should have known, at all relevant times, that the "non habit-forming" claim misleads reasonable consumers, such as Plaintiff, into buying the Product to attain the Product-attributes that Defendant falsely advertised and warranted.

48. Plaintiff and similarly situated consumers would not have purchased the Product, or would not have overpaid a price premium for the Product, if they had known that the "non habit-forming" claim was false and, therefore, the Product does not have the attribute claimed, promised, warranted, advertised, and/or represented. Accordingly, based on Defendant's material misrepresentations and omissions, reasonable consumers, including Plaintiff, purchased the Product to their detriment.

**D.      No Adequate Remedy At Law**

49. Plaintiff and members of the Class are entitled to equitable relief as no adequate remedy at law exists.

50. **Broader Statutes of Limitations:** The statutes of limitations for the causes of action pled herein vary. The limitations period is four years for claims brought under the UCL, which is one year longer than the statutes of limitations under the FAL and CLRA. In addition, the statutes of limitations vary for certain states' laws for fraud, breach of warranty, and unjust enrichment/restitution, between approximately 2 and 6 years. Thus, California Subclass Members who purchased the Product more than 3 years prior to the filing of the complaint will be barred from recovery if equitable relief were not permitted under the UCL. Similarly, Nationwide Class Members who purchased the Product prior to the furthest reach-back under the statute of limitations for breach of warranty or fraud will be barred from recovery if equitable relief were not permitted for restitution/unjust enrichment.

51. **More Prompt, Certain, and Efficient:** Legal remedies are inadequate because they are not equally prompt and certain and in other ways efficient as equitable relief. Legal claims for damages are not equally certain as restitution because claims under the UCL and other equitable claims entail few elements.

52. **Broader Scope of Conduct:** In addition, the scope of actionable misconduct under the unfair prong of the UCL is broader than the other causes of action asserted herein. It includes, for example, Defendant's overall unfair marketing scheme to promote and brand the Product with the Claims, including the Product's label and packaging, over a long period of time, in order to gain an unfair advantage over competitor products and to take advantage of consumers' desire for products that comport with the "non habit-forming" claim. The UCL also creates a cause of action for violations of law (such as statutory or regulatory requirements and court orders related to similar representations and omissions made on the type of products at issue). Thus, Plaintiff and Class Members may be entitled to restitution under the UCL, while not entitled to damages under other causes of action asserted herein (e.g., the FAL requires actual or constructive knowledge of the falsity; the CLRA is limited to certain types of plaintiffs (an individual who seeks or acquires, by purchase or lease, any goods or services for personal, family, or household purposes) and other statutorily enumerated conduct; common law fraud claims require a showing of actual deception or reliance). Similarly, unjust enrichment/restitution is broader than breach of warranty. For

example, in some states, breach of warranty may require privity of contract or pre-lawsuit notice, which are not typically required to establish unjust enrichment/restitution.  Thus, Plaintiff and Class Members may be entitled to recover under unjust enrichment/restitution, while not entitled to damages under breach of warranty, because they purchased the Product from third-party retailers or did not provide adequate notice of a breach prior to the commencement of this action.

53.    **Injunctive Relief to Cease Misconduct and Dispel Misperception:**  Injunctive relief is appropriate on behalf of Plaintiff and members of the Class because Defendant continues to misrepresent the Product with the "non habit-forming" claim.  Injunctive relief is necessary to prevent Defendant from continuing to engage in the unfair, fraudulent, and/or unlawful conduct described herein and to prevent future harm – none of which can be achieved through available legal remedies (such as monetary damages to compensate past harm).  Further, injunctive relief, in the form of removing the "non habit-forming" claim, is necessary to dispel the public misperception about the Product that has resulted from years of Defendant's unfair, fraudulent, and unlawful marketing efforts.  An injunction requiring removal of the claim will prevent the ongoing deception and repeat purchases based thereon.  It is also not available through a legal remedy (such as monetary damages).  In addition, Plaintiff is currently unable to accurately quantify the damages caused by Defendant's future harm, because discovery and Plaintiff's investigation has not yet completed, rendering injunctive relief all the more necessary.  For example, because the court has not yet certified any class, the following remains unknown: the scope of the class, the identities of its members, their respective purchasing practices, prices of past/future Product sales, and quantities of past/future Product sales.

54.    **Public Injunction:**  Further, because a "public injunction" is available under the UCL, damages will not adequately "benefit the general public" in a manner equivalent to an injunction.

55.    **Procedural Posture – Incomplete Discovery & Pre-Certification:**  Lastly, this is an initial pleading in this action, and discovery has not yet commenced and/or is at its initial stages. No class has been certified yet.  No expert discovery has commenced and/or completed.  The completion of fact/non-expert and expert discovery, as well as the certification of this case as a

class action, are necessary to finalize and determine the adequacy and availability of all remedies, including legal and equitable, for Plaintiff's individual claims and any certified class or subclass. Plaintiff therefore reserves his right to amend this complaint and/or assert additional facts that demonstrate this Court's jurisdiction to order equitable remedies where no adequate legal remedies are available for either Plaintiff and/or any certified class or subclass.  Such proof, to the extent necessary, will be presented prior to the trial of any equitable claims for relief and/or the entry of an order granting equitable relief.

<strong><u>CLASS ALLEGATIONS</u></strong>

56.     Plaintiff hereby incorporates by reference and re-alleges herein the allegations contained in all preceding paragraphs of this complaint.  Plaintiff seeks to represent the following Classes:

**Nationwide Class**: all people in the United States who purchased the Product within the applicable statute of limitations.

**Multi-state Consumer Protection Class**: all people who purchased the Product (1) in the states of Michigan, Minnesota, or New Jersey within the applicable statute of limitations; (2) in the state Missouri within the applicable statute of limitations; (3) in the states of California, Florida, Massachusetts, or Washington within the applicable statute of limitations; and (4) in the states of Illinois and New York within the applicable statute of limitations.

**California Class**: all people in California who purchased the Product within the applicable statute of limitations.

57.     Pursuant to Fed. Civ. P. 23(c)(1)(C), each of the above class definitions is a placeholder that may be altered or amended any time before final judgment.  As a result of additional information obtained through further investigation and discovery, the above-described Classes may be modified or narrowed as appropriate, including with multi-state subclasses to account for material variations in state law, if any.

58.     Excluded from the Classes are: (1) anyone who bought the Products for the purpose of resale; (2) any Judge or Magistrate presiding over this action and any members of their families; (3) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parent has a controlling interest and their current or former employees, officers, and directors; and (4) Plaintiff's counsel and Defendant's counsel.

59. **Numerosity:** At this time, Plaintiff does not know the exact number of members of the aforementioned Classes. However, given the nature of the claims, Plaintiff believes the Members of the Classes are so numerous that joinder of all members is impracticable.

60. **Commonality and Predominance:** There is a well-defined community of interest in the questions of law and facts involved in this case. Questions of law and fact common to the Classes that predominate over questions that may affect individual Class Members include:

(a)   Whether the Product is "non habit-forming."

(b)   Whether Defendant's representations and warranties are false;

(c)   Whether Plaintiff reasonably relied on Defendant's representations and warranties;

(d)   Whether Defendant's conduct violated state laws and the common law;

(e)   Whether Defendant has been unjustly enriched as a result of the unlawful conduct alleged in this Complaint such that it would be inequitable for Defendant to retain the benefits conferred upon it by Plaintiff and the members of the Classes;

(f)   Whether Plaintiff and the Class Members sustained damages as a result of Defendant's violations of state and common law.

61. **Typicality:** The claims of the named Plaintiff are typical of the claims of the Class Members because Plaintiff, like the Class Members, purchased the Product from Defendant relying on Defendant's same representations and warranties that the Product was "non habit-forming."

62. **Adequate Representation:** Plaintiff is an adequate representative of the Classes because his interests do not conflict with the interests of the Class Members he seeks to represent. Plaintiff has retained competent counsel experienced in prosecuting class actions, and he intends to prosecute this action vigorously. The interests of the Class Members will be fairly and adequately protected by Plaintiff and his counsel.

63. **Superiority:** The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of the Class Members. Each individual Member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by

the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale and comprehensive supervision by a single court on the issue of Defendant's liability.  Class treatment of the liability issue will ensure that all the claims and claimants are before this Court for consistent adjudication of issues.

### CAUSES OF ACTION

### COUNT I
**Violation of California's Consumer Legal Remedies Act (CLRA)**

64.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

65.    Plaintiff brings this cause of action on behalf of himself and the California Subclass and Multi-state Consumer Protection Class.

66.    Plaintiff and Class Members are "consumers," as the term is defined by California Civil Code § 1761(d).

67.    Plaintiff, Class Members, and Defendant have engaged in "transactions" as that term is defined by California Civil Code § 1761(e).

68.    The conduct alleged in this Complaint constitutes unfair methods of competition and unfair and deceptive acts and practices for the purpose of the CLRA, and the conduct was undertaken by Defendant in transactions intended to result in, and which did result in, the sale of goods to consumers.

69.    As alleged more fully above, Defendant has violated the CLRA by falsely representing to Plaintiff and the other Class Members that the Product is not habit-forming when in fact the Product is.

70.    As a result of engaging in such conduct, Defendant has violated California Civil Code § 1770(a)(5), (a)(7), and (a)(9).

71. Defendant's representations were likely to deceive, and did deceive, Plaintiff and reasonable consumers. Defendant knew, or should have known through the exercise of reasonable care, that these statements were inaccurate and misleading.

72. Defendant's misrepresentations were intended to induce reliance, and Plaintiff saw, read, and reasonably relied on them when purchasing Product. Defendant's misrepresentations were a substantial factor in Plaintiff's purchase decision.

73. In addition, class-wide reliance can be inferred because Defendant's misrepresentations were material, i.e., a reasonable consumer would consider them important in deciding whether to buy the "non habit-forming" Product.

74. Defendant's misrepresentations were a substantial factor and proximate cause in causing damages and losses to Plaintiff and Class Members.

75. Plaintiff and Class Members were injured as a direct and proximate result of Defendant's conduct because (1) they would not have purchased the Product if they had known that the Product was habit-forming; (2) they overpaid for the Product because the products are sold at a price premium due to Defendant's misrepresentations; or (3) they received products that were worthless for their intended purpose.

76. Accordingly, Plaintiff, on behalf of himself and all other members of the Class, seeks to enjoin the unlawful acts and practices described herein.

77. On October 23, 2024, a CLRA demand letter was sent to Defendant's headquarters and registered agent, via certified mail with return receipt requested. This letter provided notice of Defendant's violation of the CLRA, for Plaintiff and the class, and demanded that Defendant correct the unlawful, unfair, false and/or deceptive practices alleged here.

## COUNT II
### Violation of California's Unfair Competition Law (UCL)

78. Plaintiff incorporates by reference and re-alleges herein the allegations contained in all preceding paragraphs of this complaint.

79. Plaintiff brings this claim on behalf of himself and the California Subclass and Multi-state Consumer Protection Class.

80.     California Business and Professions Code § 17200 prohibits "any unlawful, unfair, or fraudulent business act or practice."  For the reasons discussed above, Defendant has engaged unlawful, unfair, and fraudulent business acts or practices in violation of California Business and Professions Code § 17200.

81.     Defendant has violated the UCL by engaging in **unlawful business practices** by violating the CLRA, Cal. Civ. Code §§1770(a)(5), (a)(7), and (a)(9), by violating California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq.,* and by violating the common law by, *inter alia*, making false representations and warranties concerning the Product and retaining the unlawfully obtained benefit therefrom.  Plaintiff reserves the right to allege additional violations of law which constitute other unlawful business acts or practices.

82.     Defendant has also violated the UCL's prohibition on **unfair business practices** because its conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct.

83.     There were reasonably available alternatives to further Defendant's legitimate business interest other than by engaging in the conduct described above.

84.     Defendant has further violated the UCL's prohibition on **fraudulent business practices** by making knowingly, or that which Defendant reasonably should know, false and misleading representations and warranties about its Product which were likely to deceive the consuming public within the meaning of Bus. & Prof. Code § 17200.

85.     Plaintiff and the Class Members suffered a substantial injury by virtue of buying the Product they would not have purchased absent Defendant's unlawful, unfair, and fraudulent marketing and advertising about the capability of its Product.

86.     There is no benefit to consumers or competition from its marketing claiming that the Product was reliably capable of performing in a manner it could not.

87.     Plaintiff and the Class Members had no way of reasonably knowing that the Product they purchased was not marketed, packaged, or labeled accurately.  Thus, they could not have reasonably avoided the injury each of them suffered.

88.     The gravity of the consequences of Defendant's conduct as described outweighs any justification, motive, or reason therefore, particularly considering the available legal alternatives which exist in the marketplace.  Such conduct is immoral, unethical, unscrupulous, offends established public policy, or is substantially injurious to Plaintiff and the Class Members.

89.     Plaintiff seeks all available relief under the UCL.

## COUNT III
**Violation of California's False Advertising Law ("FAL")**
**Cal. Bus. & Prof. Code §§ 17500, *et seq.***
**(On Behalf of the Nationwide Class and California Subclass)**

90.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

91.     Plaintiff brings this claim on behalf of himself and the California Subclass.

92.     Defendant's acts and practices, as described above, have deceived and are likely to continue to deceive Class Members and the public.  As described throughout this Complaint, Defendant misrepresented the Product as being a "non habit-forming" sleep-aid.  By its actions, Defendant disseminated uniform advertising regarding the Product to and across California and the United States.  The advertising was, by its very nature, unfair, deceptive, untrue, and misleading within the meaning of Cal. Bus. & Prof. Code §§ 17500, *et seq.*  Such advertisements were intended to – and likely did – deceive the consuming public.

93.     The above-described false, misleading, and deceptive advertising Defendant disseminated continues to have a likelihood to deceive in that Defendant represented that the Product had capabilities that it did not have.

94.     Defendant, nonetheless, continues to represent otherwise to consumers.

95.     In making and disseminating these statements, Defendant knew, or reasonably should have known, that its advertisements were untrue and misleading in violation of California law.  Plaintiff and the Class Members based their purchasing decision on Defendant's representations about the capability of its Product.  Plaintiff and the Class Members were injured in fact and lost money as a result.

96.     The misrepresentations by Defendant about the material facts described and detailed herein constitute false and misleading advertising and, therefore, constitute a violation of Cal. Bus. & Prof. Code §§ 17500, *et seq.*

97.     As a result of Defendant's wrongful conduct, Plaintiff and the Class Members lost money in an amount to be proven at trial.  Plaintiff and the Class Members are therefore entitled to restitution as appropriate for this cause of action.

98.     Plaintiff seeks all available relief under the FAL.

## COUNT IV
### Breach of Express Warranty

99.     Plaintiff hereby incorporates by reference and re-alleges herein the allegations contained in all preceding paragraphs of this complaint.

100.     Plaintiff brings this claim under California law on behalf of himself and Members of the Nationwide Class and California Subclass.

101.     As the designer, manufacturer, marketer, distributor, and/or seller of the Product, Defendant issued an express warranty by representing to consumers at the point of purchase that the Product was "non habit-forming."

102.     Defendant's representations were part of the description of the Product and the bargain upon which the Product was offered for sale and purchased by Plaintiff and Class Members who reasonably relied on those representations.

103.     In fact, the Product does not conform to the above-referenced representation because, as alleged in detail above, it is habit-forming.  Thus, the warranty was breached.

104.     On October 23, 2024, prior to the filing of this Complaint, Plaintiff's counsel sent Defendant a warranty notice letter that complied in all respects with U.C.C. 2-607.  The letter provided notice of breach of express warranty.  The letter was sent via certified mail with return receipt to Defendant advising Defendant that it was in violation of the U.C.C. 2-607 and state consumer protection laws and demanding that it cease and desist from such violations and make full restitution by refunding the monies received therefrom.  The letter stated that it was sent on behalf of Plaintiff and all other similarly situated purchasers.

105.    As a direct and proximate results of Defendant's breach, Plaintiff and the Class Members were injured because they: (1) paid money for the Product that was not as Defendant represented; (2) were deprived of the benefit of the bargain because the Product they purchased was different than Defendant advertised; and (3) were deprived of the benefit of the bargain because the Product they purchased had less value than Defendant represented.  Had Defendant not breached the express warranty by making the false representations alleged herein, Plaintiff and the Class Members would not have purchased the Product or would not have paid as much as they did for them.

106.    Plaintiff seeks all available relief under this cause of action.

## COUNT V
### Unjust Enrichment

107.    Plaintiff hereby incorporates by reference and re-alleges herein the allegations contained in all preceding paragraphs of this complaint.

108.    Plaintiff brings this claim under California law on behalf of himself and Members of the Nationwide Class and California Subclass.

109.    To the extent required by law, Plaintiff alternatively styles this cause of action as a quasi-contract claim seeking restitution.

110.    Plaintiff and Class Members conferred benefits on Defendant by purchasing the Product.

111.    Defendant has been unjustly enriched in retaining the revenues derived from Plaintiff and Class Members' purchases of the Product.  Retention of those monies under these circumstances is unjust and inequitable because Defendant warranted that the Product was "non habit-forming" when the Product did, in fact, create the risk or cause habitual use.  Defendant's misrepresentations caused injuries to Plaintiff and Class Members because they would not have purchased the Product if the true facts were known.

112.    Because Defendant's retention of the non-gratuitous benefits conferred on them by Plaintiff and Class Members is unjust and inequitable, Defendant must pay restitution to Plaintiff and Class Members for its unjust enrichment, as ordered by the Court.

113.    Plaintiff and Class Members have suffered an injury in fact and have lost money as a result of Defendant's unjust conduct.  They lack an adequate remedy at law with respect to this claim and are entitled to non-restitutionary disgorgement of the financial profits that Defendant obtained as a result of its unjust conduct.

## COUNT VI
### Fraud

114.    Plaintiff hereby incorporates by reference and re-alleges herein the allegations contained in all preceding paragraphs of this complaint.

115.    Plaintiff brings this claim under California law on behalf of himself and Members of the Nationwide Class and California Subclass.

116.    As the designer, manufacturer, marketer, distributor, and/or seller of the Product, Defendant representing to consumers that the Product was "non habit-forming" on the Product's label and packaging.

117.    Defendant's representation that the Product was "non habit-forming" was materially false and misleading because the Product is habit-forming due to its active ingredient, diphenhydramine, and its use context.

118.    Plaintiff is informed and believes and on that basis alleges that Defendant had reason to know this representation weas false when Defendant made it for the reasons described herein.

119.    Plaintiff is informed and believes and on that basis alleges that Defendant deliberately misrepresented the Product as "non habit-forming" to induce Plaintiff to purchase the Product.

120.    Plaintiff relied to his detriment on Defendant's misrepresentation by purchasing the Product.

121.    Plaintiff's reliance on Defendant's misrepresentations was justifiable in that Plaintiff had no reason to doubt the truthfulness of Defendant's representations about its Product for the reasons described herein.

122.    Defendant's intentional misrepresentations, inducing Plaintiff's reliance, was the

direct and proximate cause of Plaintiff's loss, which Plaintiff would not have sustained but for Defendant's fraud.

## REQUEST FOR RELIEF

123.   WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seek judgment against Defendant as follows:

(a)   For an order certifying the Classes under Fed. R. Civ. P. 23 and naming Plaintiff as representative of the Classes, and Plaintiff's attorneys as Counsel for the Classes;

(b)   For an order declaring that the Defendant's conduct violates the statutes referenced herein;

(c)   For an order finding in favor of Plaintiff and the Classes on all counts asserted herein;

(d)   For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

(e)   For prejudgment interest on all amounts awarded;

(f)   For an order of restitution and all other forms of equitable monetary relief;

(g)   For injunctive relief as pleaded or as the Court may deem proper;

(h)   For an order awarding Plaintiff and the Classes their reasonable attorneys' fees and expenses and costs of suit.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all claims so triable.

Dated:  December 9, 2024

**BURSOR & FISHER, P.A**.

By:   */s/ Brittany S. Scott*
                    Brittany S. Scott

L. Timothy Fisher (State Bar No. 191626)
Brittany S. Scott (State Bar No. 327132)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ltfisher@bursor.com
            bscott@bursor.com

**SMITH KRIVOSHEY, PC**
Yeremey O. Krivoshey (State Bar No. 295032)
166 Geary Street, Ste. 1500-1507
San Francisco, CA 94108
Phone: 415-839-7000
E-Mail: yeremey@skclassactions.com

**SMITH KRIVOSHEY, PC**
Joel D. Smith (State Bar No. 244902)
867 Boylston Street, 5 th Floor, Ste. 1520
Boston, MA 02116
Phone: 617-377-7404
E-Mail: joel@skclassactions.com

*Attorneys for Plaintiff*