Malcolm Segal (SBN 075481)
**Segal & Associates, PC**
500 Capitol Mall, Suite 600
Sacramento, CA  95814
Telephone: (916) 441-0886
msegal@segal-pc.com

Steven A. Zalesin (admitted *pro hac vice*)
Joshua Kipnees (admitted *pro hac vice*)
**Patterson Belknap Webb & Tyler LLP**
1133 Avenue of the Americas
New York, NY 10036
Telephone: (212) 336-2000
sazalesin@pbwt.com
jkipnees@pbwt.com

Attorneys for Defendant

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SIRREON GOODSON, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>KENVUE BRANDS LLC,<br><br>Defendant. | Civil Action No. 24-cv-03152-DC<br><br>**DEFENDANT KENVUE BRANDS LLC'S MOTION TO DISMISS AMENDED COMPLAINT [Fed. R. Civ. Pro. 12(b)(6)]**<br><br>Date: March 21, 2025<br>Time: 1:30 p.m.<br>Crtrm: 8, 13th Floor<br>Judge: Hon. Dena Coggins |

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that on March 21, 2025, at 1:30 p.m., or as soon thereafter as the matter may be heard, at the above noticed time and place, Defendant Kenvue Brands LLC, through its counsel of record, will and hereby moves pursuant to Federal Rules of Civil Procedure 8, 9, and 12(b)(6), for an Order by the Court dismissing with prejudice Plaintiff Sirreon Goodson's Amended

- i -
Kenvue's Motion to Dismiss the Amended Complaint  [Fed. R. Civ. Pro. 12(b)(6)]

Complaint (Dkt. 9), in which Plaintiff asserts claims under the California Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750; the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*; and the California False Advertising Law ("FAL"), *id.* § 17500 *et seq.*), as well as claims under common law theories of breach of express warranty, unjust enrichment, and fraud.

This motion is made pursuant to Federal Rule of Civil Procedure 12(b)(6) on the grounds set forth in the accompanying memorandum of points and authorities.

Dated: December 23, 2024    Respectfully submitted,

**Segal & Associates, PC**

/s/   *Malcolm Segal*
Malcolm Segal

**Patterson Belknap Webb & Tyler LLP**

/s/    *Steven A. Zalesin*
Steven A. Zalesin
Joshua Kipnees

**<u>MEET AND CONFER CERTIFICATION</u>**

Pursuant to this Court's Standing Order in Civil Actions § I.C

I, Joshua Kipnees, representing Kenvue Brands LLC, hereby certify that I participated in several telephone calls and exchanged correspondence with L. Timothy Fisher and Brittany Scott, Esq., counsel for Plaintiff, in an effort to resolve the issues presented by this motion without the need for motion practice.  The parties exhausted meet and confer efforts following calls on December 2, 2024 and December 5, 2024, and related correspondence.


Dated: December 23, 2024                      /s/    *Joshua Kipnees*
                                                         Joshua Kipnees

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ..........................................................................................................v

PRELIMINARY STATEMENT .....................................................................................................1

BACKGROUND ...........................................................................................................................3

    A.    Kenvue and Tylenol PM ..............................................................................3

    B.    FDA's Rigorous Evaluation of, and Labeling Requirements for, Over-the-Counter Sleep Aids ...............................................................................3

    C.    Tylenol PM Labeling ...................................................................................6

    D.    Plaintiff's Purchase and Theory of Falsity...................................................9

LEGAL STANDARD....................................................................................................................11

ARGUMENT ...............................................................................................................................12

I.    PLAINTIFF DOES NOT PLAUSIBLY ALLEGE THAT THE "NON-HABIT FORMING" LABEL STATEMENT IS FALSE OR MISLEADING ..................................12

    A.    Plaintiff's Interpretation of "Non-Habit Forming" Is Unreasonable as a Matter of Law ............................................................................................12

    B.    The Complaint Fails to Allege Tylenol PM, Used as Directed, Is Habit-Forming..................................................................................................14

II.    ANY CLAIM THAT TYLENOL PM IS FALSELY LABELED AS SAFE IS INADEQUATELY PLEADED AND EXPRESSLY PREEMPTED.....................................19

III.    THE MULTI-STATE CLASS CLAIMS FAIL FOR LACK OF STATUTORY STANDING ......................................................................................................20

IV.    THE AMENDED COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE .............21

CONCLUSION...........................................................................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aloudi v. Intramedic Rsch. Grp., LLC*,
729 F. App'x 514 (9th Cir. 2017) ............................................................................16, 17

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)...............................................................................................10

*Becerra v. Dr. Pepper/Seven Up, Inc.*,
945 F.3d 1225 (9th Cir. 2019) .................................................................................12

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)...............................................................................................10

*Ebner v. Fresh Inc.*,
838 F.3d 958 (9th Cir. 2016) ..............................................................................12, 20

*Eckler v. Wal-Mart Stores, Inc.*,
No. 12-CV-727, 2012 WL 5382218 (S.D. Cal. 2012)...................................................16

*Engram v. GSK Cons. Healthcare Holdings (US) Inc.*,
No. 19-CV-2886, 2021 WL 4502439 (E.D.N.Y. Sept. 30, 2021) ...................................15

*Fontenberry v. MV Transp.., Inc.*,
984 F. Supp. 2d 1062 (E.D. Cal. 2013).......................................................................20

*Genexa Inc. v. KinderFarms LLC*,
No. 22-CV-9291, 2023 U.S. Dist. LEXIS 65979 (C.D. Cal. Apr. 14, 2023) .................17

*Gentges v. Trend Micro Inc.*,
No. 11-CV-5574, 2012 WL 2792442 (N.D. Cal. July 9, 2012)......................................20

*Hartwich v. Kroger Co.*,
No. 20-CV-1253, 2021 WL 4519019 (C.D. Cal. Sept. 20, 2021) .................................20

*Howard v. Alchemee, LLC*,
No. 24-CV-1834, 2024 WL 4272931 (C.D. Cal. Sept. 19, 2024) .................................19

*Kearns v. Ford Motor Co.*,
567 F.3d 1120 (9th Cir. 2009) .................................................................................10

*Kwan v. SanMedica Int'l*,
854 F.3d 1088 (9th Cir. 2017) .................................................................................13

*Lopez v. Smith*,
   203 F.3d 1122 (9th Cir. 2000) ........................................................................................20

*Martin v. Doctor's Best, Inc.*,
   No. 23-CV-378, 2023 WL 6370230 (C.D. Cal. Aug. 25, 2023)......................................15

*Martin v. Onnit Labs Inc.*,
   No. 23-CV-3737, 2023 WL 8190712 (C.D. Cal. Oct. 18, 2023).................................16, 17

*McGlinchy v. Shell Chem. Co.*,
   845 F.2d 802 (9th Cir. 1988) ..........................................................................................10

*McKinnis v. Kellogg USA*,
   No. 07-CV-2611, 2007 WL 4766060 (C.D. Cal. Sept. 19, 2007) ....................................11

*Moore v. Trader Joe's Co.*,
   4 F.4th 874 (9th Cir. 2021) ..................................................................................11, 12, 13

*Morgan v. Albertsons Cos.*,
   No. 22-cv-2948, 2023 WL 3607275 (N.D. Cal. Mar. 13, 2023) ........................................3

*Nat. Res. Def. Council, Inc. v. FDA*,
   710 F.3d 71 (2d Cir. 2013), *as amended* (Mar. 21, 2013) ................................................3

*Pac. Surrogacy USA, LLC v. Bai*,
   No. 19-CV-1456, 2019 WL 8129615 (C.D. Cal. Nov. 5, 2019) ......................................11

*Prescott v. Rite Aid Corp.*,
   667 F. Supp. 3d 1011 (N.D. Cal. 2023) .....................................................................11, 13

*Punian v. Gillette Co.*,
   No. 14-CV-5028, 2016 WL 1029607 (N.D. Cal. Mar. 15, 2016)....................................11

*Red v. Gen. Mills, Inc.*,
   No. 15-CV-2232, 2015 WL 9484398 (C.D. Cal. Dec. 29, 2015)....................................14

*Red v. Kraft Foods, Inc.*,
   No. 10-CV-1028, 2012 WL 5504011 (C.D. Cal. Oct. 25, 2012).....................................18

*Smith v. GlaxoSmithKline Cons. Healthcare Holdings (US) LLC*,
   660 F. Supp. 3d 863 (N.D. Cal. 2023) ......................................................................10, 18

*Sneed v. Procter & Gamble Co.*,
   No. 23-CV-5443 (N.D. Cal. Aug. 19, 2024).....................................................................17

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)............................................................................................................3

- vi -
Kenvue's Motion to Dismiss the Amended Complaint  [Fed. R. Civ. Pro. 12(b)(6)]

*Tubbs v. AdvoCare Int'l, L.P.*,
  785 Fed. App'x 396 (9th Cir. 2019) ..................................................................................17

*Vess v. Ciba-Geigy Corp. USA*,
  317 F.3d 1097 (9th Cir. 2003) ........................................................................................11

*Wilson v. Frito-Lay N. Am., Inc.*,
  961 F. Supp. 2d 1134 (N.D. Cal. 2013) ...........................................................................19

**Statutes**

21 U.S.C. § 355h ..............................................................................................................3, 4

21 U.S.C. § 379r(a) ............................................................................................................18

28 U.S.C. § 1404(a) ............................................................................................................1

**Other Authorities**

21 C.F.R. Part 338 ................................................................................................................4

21 C.F.R. § 330.1 ...............................................................................................3, 4, 6, 19

21 C.F.R. § 338.10 ...............................................................................................................4

Fed. R. Civ. P. 12(b)(6) ..................................................................................................1, 10

Fed. R. Civ. P. 9(b) ............................................................................................................10

*Nighttime Sleep-Aid Drug Products for Over-the-Counter Human Use; Final
  Monograph*, 54 Fed. Reg. 6,814 (Feb. 14, 1989) ....................................................4, 5, 13

*Over-the-Counter Drugs*, 40 Fed. Reg. 57,292, 57,296 (Dec. 8, 1975) ............................4

"*Over-the-Counter Monograph M010: Nighttime Sleep-Aid Drug Products for Over-
  the-Counter Use*" (the "Monograph") ..............................................................................4

*Over the Counter Nighttime Sleep-Aid and Stimulant Products*, 43 Fed. Reg. 25,544,
  25,545 (June 13, 1978) .....................................................................................................5

Kenvue's Motion to Dismiss the Amended Complaint  [Fed. R. Civ. Pro. 12(b)(6)]

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
KENVUE'S MOTION TO DISMISS THE AMENDED COMPLAINT**

Defendant Kenvue Brands LLC ("Kenvue"), by and through the undersigned, hereby moves this Court, pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss Plaintiff Sirreon Goodson's ("Plaintiff") Amended Complaint ("AC") (Dkt. 9) in its entirety and with prejudice.[1]

**PRELIMINARY STATEMENT**

In this putative class action, Plaintiff claims that the "non-habit forming" statement on the label of Tylenol® PM is false because he "developed a habit" of using the product, and it is unsafe. His claims fail three times over: Plaintiff's alleged interpretation of "non-habit forming," based on the general dictionary definition of "habit," is nonsensical in relation to use of an over-the-counter ("OTC") drug like Tylenol PM. He pleads no facts that plausibly establish that Tylenol PM or its active sleep-aid ingredient, diphenhydramine, is habit-forming—under any definition—when used as directed. And his allegations that diphenhydramine makes Tylenol PM unsafe are squarely refuted by the U.S. Food & Drug Administration's ("FDA") determination, codified in federal law, that nighttime sleep aids with diphenhydramine are safe and effective when used as directed.

Ignoring entirely the context in which it appears, Plaintiff alleges that consumers interpret the word "habit" in the "non-habit forming" label statement to mean either "often or regular[]" use or "motorically reflexive" behavior "performed with little or no conscious intent." Neither definition is appropriate in this setting. No reasonable consumer would construe "non-habit forming" on an OTC drug label to mean the product will not be used "often." Nor does Plaintiff even attempt to plead that Tylenol PM causes "motorically reflexive" behavior that divests consumers of "conscious intent." The Amended Complaint's theory of falsity thus collapses under the weight of its own inapt definitions of "habit."

Plaintiff's allegations fare no better under the relevant definition of "non-habit forming"—*i.e.*,

---

[1] Kenvue has filed a separate motion to transfer the venue of this action to the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1404(a). *See* ECF No. 17.

Defendant Kenvue's Motion to Dismiss the Amended Complaint
[Fed. R. Civ. Pro. 12(b)(6)]

a drug that does not cause or tend to cause addiction.  The Amended Complaint is devoid of allegations that plausibly establish that Tylenol PM or diphenhydramine, when used in accordance with the FDA-mandated dosage instructions printed on the label, causes or creates a risk of addiction.  In point of fact, FDA and decades of scientific research have consistently reached the opposite conclusion.  Ignoring this consensus, the Amended Complaint cites to a handful of articles describing individual instances of diphenhydramine abuse involving intake of massive amounts for long periods, such as for self-treatment of psychiatric disorders.  None of these authorities indicates that use of Tylenol PM as directed leads to diphenhydramine addiction.  Plaintiff thus fails to plausibly allege that the "non-habit forming" label statement is false or misleading.

Plaintiff also alleges that "non-habit forming" communicates a false message that Tylenol PM and its diphenhydramine ingredient are safe, listing a variety of adverse health effects allegedly associated with diphenhydramine use.  Tellingly, he does not plead that such maladies occur when diphenhydramine is taken at the dosages directed, nor does he explain how purported safety concerns unrelated to addiction render the "non-habit forming" statement false.  In any event, FDA concluded decades ago that nighttime sleep aids with diphenhydramine that comply with federal labeling requirements—which Tylenol PM undisputedly does—are "safe and effective."  To this day, FDA stands by that conclusion.  Plaintiff's challenge to Tylenol PM's supposed safety messaging thus is both inadequately pleaded and preempted by federal law.

Although the Amended Complaint fails in its entirety due to its untenable theory of falsity, this is not its only defect.  The claims of the putative multi-state class, brought solely under California consumer protection statutes, also fail for lack of statutory standing, since non-California residents cannot assert claims under California law for purchases made outside of California.

For all of these reasons, the Amended Complaint should be dismissed with prejudice.

## BACKGROUND[2]

### A.     Kenvue and Tylenol PM

Kenvue Brands LLC is a consumer health company organized in Delaware.  Kenvue produces and markets many well-known skin health, self-care, and essential health products, including OTC (*i.e.*, non-prescription) drugs.  Among these, Kenvue produces and sells Tylenol®, currently the leading brand of OTC pain relievers in the United States.  One of the product offerings sold under the Tylenol brand is Tylenol PM, which combines acetaminophen, a pain reliever, with diphenhydramine hydrochloride, a nighttime sleep aid.  *See* AC ¶ 5.  The Amended Complaint does not allege that acetaminophen is habit-forming or unsafe.  Instead, its allegations are addressed solely to Tylenol PM's diphenhydramine ingredient.  *Id.* ¶¶ 4–5.

### B.     FDA's Rigorous Evaluation of, and Labeling Requirements for, Over-the-Counter Sleep Aids

To comply with federal law, OTC drugs must be labeled and marketed in accordance with the relevant FDA "monograph." 21 U.S.C. § 355h.  FDA monographs are developed by "advisory review panels of qualified experts to evaluate the safety and effectiveness of over-the-counter drugs, [and] to review their labeling." *Morgan v. Albertsons Cos.*, No. 22-cv-2948, 2023 WL 3607275, at *2 (N.D. Cal. Mar. 13, 2023).  "Like a recipe, each monograph sets out the FDA-approved active ingredients for a given therapeutic class of OTC drugs" and specifies acceptable doses, formulations, and labeling for those ingredients. *Nat. Res. Def. Council, Inc. v. FDA*, 710 F.3d 71, 75 (2d Cir. 2013), *as amended*

---

[2] These facts are taken from the Amended Complaint, which are assumed to be true solely for purposes of this motion; product labeling and scientific articles incorporated by reference in the Amended Complaint; and matters of which the Court may take judicial notice, such as FDA pronouncements and dictionary definitions. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). Certain materials of which Kenvue seeks judicial notice are described in the accompanying Request for Judicial Notice and attached to the December 23, 2024 Declaration of Joshua Kipnees in Support of this Motion to Dismiss ("Kipnees MTD Decl.").

(Mar. 21, 2013); *see also* 21 C.F.R. § 330.1.  An OTC drug that complies with the relevant monograph "is generally recognized as safe and effective and is not misbranded."  21 C.F.R. § 330.1.

OTC products marketed for use as nighttime sleep aids, like Tylenol PM, must comply with a final monograph established by FDA titled "*Over-the-Counter Monograph M010: Nighttime Sleep-Aid Drug Products for Over-the-Counter Use*" (the "Monograph"), available at https://www.accessdata.fda.gov/drugsatfda_docs/omuf/OTCMonograph_M010-NighttimeSleepAid DrugProductsforOTCHumanUse_09202021.pdf.  The Monograph was codified at 21 C.F.R. Part 338 and issued as a final administrative order in 2021 pursuant to the CARES Act,  which deemed OTC drug monographs to have the force of federal law.[3]  Diphenhydramine, in either its hydrochloride or citrate form, is the only sleep-aid active ingredient the Monograph permits for OTC nighttime sleep aids.  *See* M010.10 (codified at 21 C.F.R. § 338.10).[4]  The Monograph requires nighttime sleep aids with diphenhydramine hydrochloride to be labeled with specific dosage instructions and warnings.  M010.50(c)-(d).  These include specifications that adults and children over 12 years old should take a dosage equivalent to 50mg of diphenhydramine hydrochloride at bedtime, and a warning to consult a doctor "if sleeplessness persists continuously for more than 2 weeks."  M010.50(c)(2), (d)(1).  As the Monograph itself specifies, OTC nighttime sleep aids that comply with the Monograph's requirements (and general requirements in 21 C.F.R. § 330.1) are "generally recognized as safe and effective."  M010.1; *see also* 21 C.F.R. § 330.1.  Stated differently, if a nighttime sleep aid with diphenhydramine is formulated and labeled in accordance with the Monograph, it is safe and effective as a matter of federal law.

---

[3] The Monograph was initially established through the regulatory rulemaking process, beginning with a notice of proposed rulemaking issued in 1975 and resulting in a final monograph issued in 1989. *See* 54 Fed. Reg. 6,814, 6,814 (Feb. 14, 1989) (codified at 21 C.F.R. pt. 338, as amended).  In 2020, the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act") revised the regulatory framework to allow issuance of monographs via administrative order, *see* 21 U.S.C. § 355h(a)(1); Pub. L. No. 116-136, div. A, title III, § 3851(a) (2020), and the FDA issued the operative Monograph under that process on September 20, 2021.  *See* Final Administrative Order OTC000002.

[4] All cites to the Monograph are codified at the corresponding provision of 21 C.F.R. Part 338.

- 4 -

Kenvue's Motion to Dismiss the Amended Complaint  [Fed. R. Civ. Pro. 12(b)(6)]

The Monograph was developed through nearly five decades of FDA scientific analysis, factfinding, rulemaking, and public notice-and-comment periods. As part of its analysis and factfinding, FDA specifically considered whether over-the-counter sleep aids containing diphenhydramine, an antihistamine, were "habit-forming or addicting," *Over-the-Counter Drugs*, 40 Fed. Reg. 57,292, 57,296 (Dec. 8, 1975), and concluded that they are not. As FDA recognized when publishing a tentative final monograph, medications containing diphenhydramine and other antihistamines "have generally been regarded as having low abuse potential and no ability to create dependency." *Over the Counter Nighttime Sleep-Aid and Stimulant Products*, 43 Fed. Reg. 25,544, 25,545 (June 13, 1978). Further, FDA did "not [find] sufficient evidence of pharmacological potential for misuse or abuse" that would "warrant placing [over-the-counter] nighttime sleep-aids on prescription or recommending that they be subject to increased controls." *Id.* at 25,547. In sum, FDA concluded, "there is little or no pharmacologic potential for abuse of the ingredients in [OTC] nighttime sleep aids." *Id.*

More than a decade later, when publishing its final monograph, FDA reaffirmed these conclusions. *Nighttime Sleep-Aid Drug Products for Over-the-Counter Human Use; Final Monograph*, 54 Fed. Reg. 6,814 (Feb. 14, 1989). The final monograph permitted OTC sales of sleep aids containing diphenhydramine because FDA concluded "there were no unresolved safety or effectiveness issues relating to the use of diphenhydramine as an OTC nighttime sleep-aid." 54 Fed. Reg. at 6,814. In particular, FDA concluded that "diphenhydramine hydrochloride in a dose of 50 mg is safe and effective as an OTC nighttime sleep-aid." *Id.* at 6,824.

When drawing those conclusions, FDA specifically considered a public comment "concerned with the drug abuse potential of diphenhydramine," and determined the concern was unfounded. *Id.* at 6,824. In particular, FDA reviewed data provided by the commenter, which involved overdoses of diphenhydramine. FDA determined that these data "do not present a clear picture of deliberate misuse and abuse of diphenhydramine, nor do they show that diphenhydramine marketed OTC as a nighttime sleep-aid at a recommended dose of 50 mg of diphenhydramine hydrochloride . . . is likely to become

- 5 -

Kenvue's Motion to Dismiss the Amended Complaint  [Fed. R. Civ. Pro. 12(b)(6)]

a serious risk to public health through abuse." *Id.* at 6,825. Instead, the data suggested that diphenhydramine was being "represented as a more potent substance," counterfeit methaqualone; "[b]ut misuse of a drug such as diphenhydramine that occurs because the drug is represented as a more potent substance does not necessarily mean that the drug itself is a drug of abuse." *Id.* Thus, FDA concluded that "[t]he reports of diphenhydramine abuse cited by the comment do not indicate a widespread problem, nor do they show any correlation between this abuse and OTC marketing of the drug." *Id.* At the same time, FDA pledged "to monitor this situation carefully and [to] take appropriate action if additional information should become available concerning diphenhydramine abuse as a result of OTC marketing." Notably, in the 35 years since, FDA has taken no such action, nor has it ever revised or questioned these conclusions—including when issuing the operative Monograph via administrative order just three years ago.

**C.    Tylenol PM Labeling**

Plaintiff does not dispute that Tylenol PM's label complies with each of the Monograph's labeling requirements and the general conditions of 21 C.F.R. § 330.1.

The front panel list the active ingredients, Acetaminophen and Diphenhydramine HCl, and identifies the product (as required, *see* M010.50(a)) as a "pain reliever" and "nighttime sleep aid." Kipnees MTD Decl., Ex. A.  In smaller text, the front panel states, "non-habit forming."  *Id.*

The side and back labels display the "Drug Facts" panels, which list Warnings and Instructions. *Id.*  The right side label, on which the "Drug Facts" begin, states prominently at the top "Important: Read all product information before using."  *Id.*  The "Uses" section informs consumers that Tylenol PM should be used for "occasional" pain relief with accompanying sleeplessness.  *Id.*  The back panel includes all warnings required by M010.50(c), including "do not use" "in children under 12 years of age" and "**Stop use and ask a doctor if** ■ sleeplessness persists continuously for more than 2 weeks." *Id.*  (bold in original).  The left side panel includes a "Directions" section which instructs users "**do**



**not take more than directed**."  *Id.* (bold in original).  Consistent with M010.50(d), the same section informs consumers that the amount "directed" is "2 caplets at bedtime," for a total of 50 mg of diphenhydramine HCl per day, in "adults and children 12 years and over," while reiterating that "children under 12 years" should "not use."  *Id.*

**Right Side**                                                **Left Side**

Important: Read all product information before using.
Keep this box for important information.

## Drug Facts

| Active ingredients (in each caplet) | Purpose |
|---|---|
| Acetaminophen 500 mg ................................ | Pain reliever |
| Diphenhydramine HCl 25 mg................ | Nighttime sleep aid |

Uses temporary relief of occasional headaches and minor aches and pains with accompanying sleeplessness

## Warnings

Liver warning: This product contains acetaminophen. Severe liver damage may occur if you take
- more than 4,000 mg of acetaminophen in 24 hours
- with other drugs containing acetaminophen
- 3 or more alcoholic drinks every day while using this product

Allergy alert: acetaminophen may cause severe skin reactions. Symptoms may include:
- skin reddening     - blisters     - rash

If a skin reaction occurs, stop use and seek medical help right away.

## Do not use
- with any other drug containing acetaminophen (prescription or nonprescription). If you are not sure whether a drug contains acetaminophen, ask a doctor or pharmacist.

---

## Drug Facts (continued)

Overdose warning: In case of overdose, get medical help or contact a Poison Control Center right away. (1-800-222-1222) Quick medical attention is critical for adults as well as for children even if you do not notice any signs or symptoms.

## Directions
- do not take more than directed (see overdose warning)

| adults and children 12 years and over | - take 2 caplets at bedtime<br>- do not take more than 2 caplets of this product in 24 hours |
|---|---|
| children under 12 years | do not use |

## Other information
- store between 20-25°C (68-77°F)
- do not use if carton is opened. Do not use if foil inner seal imprinted with "TYLENOL" is broken or missing

Inactive ingredients carnauba wax, crospovidone, FD&C blue no. 1 aluminum lake, hypromellose, magnesium stearate, microcrystalline cellulose, polyethylene glycol, polysorbate 80, povidone, pregelatinized starch, sodium starch glycolate, stearic acid, titanium dioxide

## Questions or comments?
call 1-877-895-3665 (toll-free) or 215-273-8755 (collect)

Kenvue's Motion to Dismiss the Amended Complaint  [Fed. R. Civ. Pro. 12(b)(6)]

**Back**



### D.    Plaintiff's Purchase and Theory of Falsity

Plaintiff is a California resident who allegedly purchased Tylenol PM products from retail stores in Sacramento in or around November 2023.  AC ¶¶ 15-16.  He claims that he relied on the "non-habit forming" label statement when making his purchase decision, and interpreted it as a promise the product would "provide the advertised benefits, relief, and support without causing habitual use or negative health outcomes." *Id.* ¶ 16.  According to Plaintiff, when he "took the Product as directed by Defendant, he developed a habit, contrary to the 'non habit-forming' claims." *Id.*  He alleges that he therefore was misled and overpaid for the product.  *Id.*

Plaintiff's claims all rest on his allegation that "non-habit forming," as he interprets the phrase, is false or misleading.  Specifically, he alleges that "non-habit forming" means "does not and cannot cause habitual use," which he defines with reference to inapt definitions of "habit" in the American Psychology Association's ("APA") Dictionary of Psychology, the Cambridge Dictionary, and

- 9 -

Kenvue's Motion to Dismiss the Amended Complaint  [Fed. R. Civ. Pro. 12(b)(6)]

Merriam-Webster.  AC ¶¶ 39–40.  These dictionaries, as quoted by Plaintiff, define "habit" in two ways: (1) behavior that is "usual" or done "often and regularly," *id.* (quoting Merriam Webster and Cambridge Dictionary); or (2) "motorically reflexive" behavior that occurs "with little or no conscious intent," *id.* ¶ 40 n.1 (quoting APA Dictionary of Psychology) or is "nearly or completely involuntary," *id.* ¶ 40 (quoting Merriam Webster).  But these general definitions pertain to "habits" only in the most general sense—such as a habit of putting one's right sock on before the left.  The Amended Complaint offers no definition of the term "habit-forming" relevant to a drug.

Plaintiff's theory of falsity rests on two sets of allegations beyond his own experience.  First, he alleges Tylenol PM is "habit-forming" because consumers who take diphenhydramine can develop "[t]olerance . . . in as little as 1-2 weeks." AC ¶ 7.  However, the Amended Complaint also recognizes that tolerance is distinct from dependency or addiction (and even "habitual use").  For example, Plaintiff alleges that tolerance of diphenhydramine is a precursor to increased use, which in turn can lead to dependency, and "[t]he result is habitual use." *Id.*  There is no allegation that dependency or "habitual use" can develop within two weeks—the outer bound of use directed by Tylenol PM's label (and the Monograph) without consulting a doctor.

Second, Plaintiff lists references to 13 scientific studies of "diphenhydramine abuse" or "misuse," claiming, without elaboration, that these "demonstrate[] that diphenhydramine is habit-forming."  AC ¶ 35.  These articles, which include case studies of individual patients' use of diphenhydramine to self-medicate psychiatric conditions, discuss the impact of massive dosages of diphenhydramine taken over periods of months or even years. *See infra* at Section I.B.  None discuss Tylenol PM, nor use of diphenhydramine taken at doses or frequencies remotely comparable to those directed on the label.  Nor do any of these scientific studies conclude that an increased tolerance results in addiction or abuse.

Plaintiff also alleges that "non-habit forming" conveys a false message that diphenhydramine is safe. *Id.* ¶ 47.  To support those allegations, he unspools a laundry list of adverse health effects supposedly caused by diphenhydramine—for example "increased risk of delirium" in "[h]ospitalized

- 10 -
Kenvue's Motion to Dismiss the Amended Complaint  [Fed. R. Civ. Pro. 12(b)(6)]

elderly people," AC ¶ 26; "dementia and Alzheimer's" following "long-term, frequent use," *id.* ¶¶ 26-27; and a "[n]ext day 'hang over effect[],'" *id.* ¶ 30.

On the basis of these allegations, Plaintiff asserts claims on his own behalf, and on behalf of a class of California purchasers, for violations of California's consumer protection statutes (the Consumer Legal Remedies Act (the "CLRA"), Unfair Competition Law ("UCL"), and False Advertising Law ("FAL")), as well as for breach of express warranty, unjust enrichment, and fraud. *Id.* ¶¶ 56, 64–122. He also brings claims for breach of express warranty, unjust enrichment, and fraud on behalf of a nationwide class, and claims for violations of the CLRA and UCL on behalf of a "Multi-state Consumer Protection Class" consisting of people who purchased Tylenol PM in ten states (Michigan, Minnesota, New Jersey, Missouri, California, Florida, Massachusetts, Washington, Illinois, and New York). *Id.* ¶ 56.

**LEGAL STANDARD**

Under Federal Rule of Civil Procedure 12(b)(6), a complaint must be dismissed when it fails to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). To satisfy this standard, the complaint must contain "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Rather, the complaint must be supported by "[f]actual allegations" which are sufficient "to raise a right to relief above the speculative level," and which "nudge[] the[] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 555, 570. While the Court must accept well-pleaded facts as true, "conclusory allegations without more are insufficient to defeat a motion to dismiss." *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 810 (9th Cir. 1988) (citation omitted). Claims that rest on alleged "facts . . . merely consistent with a defendant's liability" fail as a matter of law. *Smith v. GlaxoSmithKline Cons. Healthcare Holdings (US) LLC*, 660 F. Supp. 3d 863, 869 (N.D. Cal. 2023) (citation and internal quotation marks omitted).

Moreover, for Plaintiff's claims that sound in fraud, he must satisfy the heightened particularity requirements of Federal Rule of Civil Procedure 9(b) to state a claim for relief. *Kearns v. Ford Motor*

- 11 -

Kenvue's Motion to Dismiss the Amended Complaint  [Fed. R. Civ. Pro. 12(b)(6)]

*Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009) ("Rule 9(b)'s heightened pleading standards apply to claims for violations of the CLRA and UCL.") (citing *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1102-07 (9th Cir. 2003)); *Pac. Surrogacy USA, LLC v. Bai*, No. 19-CV-1456, 2019 WL 8129615, at *4 (C.D. Cal. Nov. 5, 2019) (same for FAL claims as well as any other claims "grounded in fraud").

## ARGUMENT

### I.     PLAINTIFF DOES NOT PLAUSIBLY ALLEGE THAT THE "NON-HABIT FORMING" LABEL STATEMENT IS FALSE OR MISLEADING

The Amended Complaint fails to plausibly allege that the "non-habit forming" statement on Tylenol PM's label is false or misleading.  This is fatal to all of Plaintiff's causes of action, which each require him to plead a materially false or misleading statement.  *Moore v. Trader Joe's Co.*, 4 F.4th 874, 880-86 (9th Cir. 2021) (affirming dismissal of CLRA, UCL, FAL, breach of warranty, and fraud claims upon concluding that challenged labeling "representations are not misleading as a matter of law"); *McKinnis v. Kellogg USA*, No. 07-CV-2611, 2007 WL 4766060, at *5 (C.D. Cal. Sept. 19, 2007) (dismissing breach of express warranty claim because plaintiff failed to allege any misrepresentation); *Prescott v. Rite Aid Corp.*, 667 F. Supp. 3d 1011, 1015 & n.2 (N.D. Cal. 2023) (dismissing fraud claim because plaintiff failed to allege any misleading statement).  Plaintiff's claim for unjust enrichment, which is similarly premised on the theory that Tylenol PM is mislabeled, AC ¶ 111, fails for the same reason.  *Punian v. Gillette Co.*, No. 14-CV-5028, 2016 WL 1029607, at *18 (N.D. Cal. Mar. 15, 2016) (dismissing claim for unjust enrichment "premised on the same factual allegations" as consumer protection claims due to failure to plead an actionable misstatement).

### A.     Plaintiff's Interpretation of "Non-Habit Forming" Is Unreasonable as a Matter of Law

As an initial matter, Plaintiff's definition of "non-habit forming" on Tylenol PM's label is unreasonable as a matter of law.  To survive dismissal, Plaintiff "must demonstrate that a 'reasonable consumer' is likely to be misled" by the challenged labeling statement.  *Moore*, 4 F.4th at 881-82.  To meet this standard, he "must demonstrate 'more than a mere possibility that [the seller's] label might

conceivably be misunderstood by some few consumers viewing it in an unreasonable manner.'" *Id.* (citing *Ebner v. Fresh Inc*., 838 F.3d 958, 965 (9th Cir. 2016)).  Rather, he must plausibly allege that, when viewing the challenged labeling statement "in its proper context," "a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances," would likely be misled as he allegedly was.  *Becerra v. Dr. Pepper/Seven Up, Inc.*, 945 F.3d 1225, 1228-29 (9th Cir. 2019) (citation and internal quotation marks omitted).

Plaintiff alleges that he was misled by Tylenol PM's label because "he developed a habit" of taking it, and that reasonable consumers understand "non-habit forming" consistent with general definitions of the term "habit."  AC ¶ 40.  The definitions he cites describe a "habit" as either "regular" behavior ("something that you do often and regularly" or "a … usual manner of behavior") or "involuntary" behavior (something you do "without knowing that you are doing it," "an acquired mode of behavior that has become nearly or completely involuntary," "automatic sequence of behaviors … [that] has become motorically reflexive" and "is performed with little or no conscious intent").  *Id.* ¶ 40 & n. 1 (citing APA Dictionary of Psychology, Merriam-Webster, and the Cambridge Dictionary). Based on these definitions, Plaintiff alleges that the "non-habit forming" statement is false because Tylenol PM "promotes habitual use as a part of consumers' nightly routine[.]"  *Id.* ¶ 43.  Stated differently, Plaintiff alleges that Tylenol PM is "habit forming" because it causes consumers to use it "often," and/or without "conscious intent" of taking it.

Plaintiff's interpretation of Tylenol PM's label is nonsensical, as his definitions of "habit" are plainly inapplicable.  No reasonable consumer would construe Tylenol PM's "non-habit forming" labeling statement to differentiate Tylenol PM from "something you [may] do often and regularly"— such as making one's bed or biting one's nails—or as a promise that the product will not induce "involuntary," "motorically reflexive" behavior.  At any rate, the Amended Complaint nowhere alleges that Tylenol PM causes "reflexive" or "involuntary" use—meaning Plaintiff's claims fail under even this proffered definition.

Instead, the "non-habit forming" labeling statement must be read "[i]n the context of the

- 13 -
Kenvue's Motion to Dismiss the Amended Complaint  [Fed. R. Civ. Pro. 12(b)(6)]

transaction"—the purchase of an OTC drug used for pain relief and sedation. *Prescott v. Rite Aid Corp.*, 667 F. Supp. 3d 1011, 1014 (N.D. Cal. 2023); *Moore*, 4 F.4th at 882 (at the pleading stage, the reasonable consumer inquiry "should take into account all the information available to consumers and the context in which that information is provided and used") (citations and internal quotation marks omitted). In this context, the only reasonable interpretation of "habit-forming" is causing or likely to cause addiction or abuse. As even Plaintiff's chosen sources recognize, this well-known term is distinct from the more general term "habit," and is specific to drug intake. *See, e.g.*, Kipnees MTD Decl., Ex. O (Merriam-Webster definition of "habit forming": "Inducing the formation of an addiction"); *id.*, Ex. Q at (APA Dictionary of Psychology definition of "habit-forming drug": a "drug with abuse potential," *i.e.*, having "the relative likelihood . . . [to] reinforce drug-taking behavior to the point of abuse"); *see also id.*, Ex. R (Dictionary.com definition: "tending to cause or encourage addiction, especially through physiological dependence").

**B.      The Complaint Fails to Allege Tylenol PM, Used as Directed, Is Habit-Forming**

Consistent with this definition, the "non-habit forming" label statement truthfully informs consumers that Tylenol PM, when used as directed, does not tend to cause addiction or abuse. This mirrors what FDA itself concluded when developing the Monograph, based on the scientific consensus that OTC sleep aids "hav[e] low abuse potential and no ability to create dependency"—and a corresponding absence of evidence that "diphenhydramine marketed OTC as a nighttime sleep-aid at a recommended dose of 50 mg of diphenhydramine hydrochloride . . . is likely to become a serious risk to public health through abuse." 54 Fed. Reg. at 6,825. FDA expressly relied on those conclusions in determining that diphenhydramine, when used as the Monograph-required label directs, "is safe and effective as an OTC nighttime sleep-aid." *Id.* at 6,824.

The Amended Complaint fails to plead facts "affirmatively disproving" these conclusions, or the broader consensus that a daily 50 mg dose of diphenhydramine is non-habit forming. *Kwan v. SanMedica Int'l*, 854 F.3d 1088, 1091–92 (9th Cir. 2017) (affirming district court's conclusion that to sufficiently plead "advertising representations [are] false," plaintiff "must allege facts affirmatively

- 14 -

Kenvue's Motion to Dismiss the Amended Complaint  [Fed. R. Civ. Pro. 12(b)(6)]

disproving" those representations) (citation omitted).  None of Plaintiff's allegations plausibly establish that Tylenol PM or diphenhydramine, when used as directed, causes or is likely to cause addiction or abuse.

First, Plaintiff alleges that diphenhydramine is "habit-forming" because consumers "can quickly develop a tolerance, requiring larger and larger doses for the same sedating effect," and that such "[t]olerance can develop in as little as 1-2 weeks." AC ¶ 34.  But even taking these allegations at face value, they fail to establish that *addiction* to diphenhydramine can develop within two weeks of use.  Tolerance is not addiction.  Rather, "tolerance," in the context of drugs, means "the capacity of the body to endure or become less responsive to a substance." Kipnees MTD Decl., Ex. P (Merriam-Webster definition of tolerance).  The Amended Complaint even acknowledges that tolerance and addiction are separate concepts, alleging that "tolerance" can eventually lead to "dependency," which in turn can eventually lead to "abuse." AC ¶ 8.  In other words, even accepting his allegations as true, Plaintiff pleads, at most, that diphenhydramine becomes less effective within two weeks of use[5]—not that such use creates risk of addiction.  Although the Amended Complaint contains stray references to diphenhydramine "abuse" and "addiction," there is no allegation that such abuse or addiction occurs or is likely to occur within two weeks of use, let alone when intake is limited to the directed dosage amount (50 mg/day).  This omission is critical because the label directions specifically instruct consumers to "***stop use and ask a doctor***" if sleeplessness persists for more than two weeks.  To the extent Plaintiff contends the "non-habit forming" statement is rendered false when consumers ignore these directions for use, his position is inherently unreasonable.  *Red v. Gen. Mills, Inc.*, No. 15-CV-2232, 2015 WL 9484398, at *5 & n.2 (C.D. Cal. Dec. 29, 2015) (rejecting as unreasonable plaintiff's allegation that she should not be "expect[ed]… to read the label before purchasing" and collecting decisions that "have declined to recognize claims stemming from a plaintiff's failure to read and heed

---

[5] FDA, of course, disagreed with this premise when concluding that use of diphenhydramine nighttime sleep-aids for two weeks is "safe and effective" as a matter of federal law.  *See* 54 Fed. Reg. at 6,814; M010.1, M010.50(c)(2).

Kenvue's Motion to Dismiss the Amended Complaint  [Fed. R. Civ. Pro. 12(b)(6)]

product labels") (citation omitted).  This is particularly true of OTC medicines, whose directions for use are "especially important to read" because consumers obtain and use those medicines without seeing a doctor.  Kipnees MTD Decl., Ex. S (FDA, *The Over-the-Counter Drug Facts Label*, https://www.fda.gov/drugs/understanding-over-counter-medicines/over-counter-drug-facts-label, last accessed Dec. 23, 2024); *Engram v. GSK Cons. Healthcare Holdings (US) Inc.*, No. 19-CV-2886, 2021 WL 4502439, at *5 (E.D.N.Y. Sept. 30, 2021) ("[C]onsumers [are] accustomed to seeing the FDA-mandated 'Directions' on the back of an over-the-counter product").

Second, Plaintiff lists the names of 13 scientific articles and broadly alleges they show "diphenhydramine is habit-forming, or alternatively, is more likely than not to be habit-forming."  AC ¶ 35.  These articles are incorporated into the complaint by reference, and therefore may properly be considered on a motion to dismiss.  *Martin v. Doctor's Best, Inc.*, No. 23-CV-378, 2023 WL 6370230, at *6 (C.D. Cal. Aug. 25, 2023).  But they are no help to Plaintiff.  They uniformly describe isolated accounts of diphenhydramine abuse or addiction that arose after use of excessive dosages—as much as 20 times higher than permitted by Tylenol PM's label—over long periods of time.  Some of these articles conclude that "[r]eported cases of [diphenhydramine] dependence have resulted from usage of large doses (often over 1,000mg per day) over periods of months or years."  Kipnees MTD Decl., Ex. M at 6 (reviewing a collection of articles reporting on individual instances of diphenhydramine abuse);[6] *see also id.*, Ex. H at 1 ("Reported cases of [diphenhydramine] dependence have resulted from usage of large doses (often over 1,000 mg per day) over periods of months or years, usually in adult males, often those with schizophrenia who are taking antipsychotics.").[7]  Others discuss individual case studies (*i.e.*, review of a single patient's interaction with the drug) involving long periods of consistent use of extreme dosages for purposes other than as a nighttime sleep-aid, including treatment

[6] Fabrizio Schifano, *et al.*, *Focus on Over-the-Counter Drugs' Misuse: A Systematic Review on Antihistamines, Cough Medicines, and Decongestants*, Frontiers in Psychiatry (May 7, 2021).
[7] Barbara Gracious, *et al.*, *The Importance of Taking a History of Over-the-Counter Medication Use: a Brief Review and Case Illustration of "PRN" Antihistamine Dependence in a Hospitalized Adolescent* at 1, J. Child & Adolescent Psychopharmacology (Dec. 2010).

- 16 -
Kenvue's Motion to Dismiss the Amended Complaint  [Fed. R. Civ. Pro. 12(b)(6)]

for psychiatric issues.  Kipnees MTD Decl., Ex. B (discussing patient taking 1500 milligrams (1.5 grams) of diphenhydramine and noting the ingredient's "potential for abuse" when prescribed to "vulnerable psychiatric populations");[8] *id.*, Ex. N (discussing schizophrenic patient self-medicating for tremors with 200-300 milligrams of diphenhydramine every three hours);[9] *id.*, Ex. C at 516-17 (patient ingesting hundreds of milligrams of diphenhydramine per day, along with episodic alcohol use, for the "knock-out effect");[10] *id.*, Ex. F (reviewing potential for abuse in patients already experiencing drug dependency and schizophrenia).[11]

None of these articles, however, conclude or imply that a daily dose of 50 milligrams of diphenhydramine, taken for a period of two weeks or less, leads to addiction or abuse.  The cited materials therefore fail to "plausibly debunk" the veracity of the "non-habit forming" labeling statement.  *Martin v. Onnit Labs Inc.*, No. 23-CV-3737, 2023 WL 8190712, at *5 (C.D. Cal. Oct. 18, 2023) (citation and internal quotation marks omitted); *id.* (to support allegations that the challenged advertisement is false, "a study's conclusion must directly address the misrepresentation it is cited to debunk") (citation omitted); *see also Aloudi v. Intramedic Rsch. Grp., LLC*, 729 F. App'x 514, 516 (9th Cir. 2017) (affirming dismissal of false advertising claims where studies cited in complaint to establish falsity did not examine effects of "same active ingredients as [the challenged product], in a dose similar to that in [the challenged product]"); *Eckler v. Wal-Mart Stores, Inc.*, No. 12-CV-727, 2012 WL 5382218, at *7 (S.D. Cal. 2012) ("[T]he Court cannot accept that the studies [plaintiff] cites lend 'facial plausibility' to her claims" because the studies did not "address the far more general claim … made by the [product's] representations").  This "stark disconnect between the scientific studies and the claims made about [the product's] benefits is fatal to the [c]omplaint." *Martin v. Onnit Labs*

---

[8] Caroline Bonham & Florian Birkmayer, *Severe Diphenhydramine Dependence and Withdrawal: Case Report*, J. Dual Diagnosis (Jan. 20, 2009).
[9] A. Thomas, *et al.*, *Diphenhydramine Abuse and Detoxification: a Brief Review and Case Report*, J. Psychopharmacology (Feb. 28, 2008).
[10] D. Cox, *et al.*, *Diphenhydramine Dependence*, Addiction (March 2001).
[11] Sebastian Erb & Tom Bschor, *Diphenhydramine Addiction and Detoxification. A Systematic Review and Case Report*, Psychiatrische Praxis (July 2013).

- 17 -
Kenvue's Motion to Dismiss the Amended Complaint  [Fed. R. Civ. Pro. 12(b)(6)]

*Inc.*, 2023 WL 81907121, at *7 (citation and internal quotation marks omitted). And tellingly, when faced with a similar labeling challenge involving a sleep aid with diphenhydramine, another court found no "evidence that plausibly supports [plaintiffs'] claim" that the "non-habit forming" representation was false, and dismissed the complaint. *Sneed v. Procter & Gamble Co.*, No. 23-CV-5443 (Dkt. 45) at *14–15 (N.D. Cal. Aug. 19, 2024).

At bottom, Plaintiff cannot plead the "non-habit forming" statement is false by citing evidence suggesting that if a consumer were to consume diphenhydramine at massive doses, for an extended period, in defiance of the label directions, it may eventually lead to addiction or abuse. In *Genexa Inc. v. KinderFarms LLC*, No. 22-CV-9291, 2023 U.S. Dist. LEXIS 65979 (C.D. Cal. Apr. 14, 2023), the court rejected a similar argument. *Id.* at *19. The plaintiff alleged that the defendant's OTC drug was falsely labeled as "non-toxic" because the drug's active ingredient (acetaminophen), even if non-toxic at labeled doses, carried "potential to cause harm at excess dosages." *Id.* at *21. The court dismissed this claim, concluding the plaintiff's theory of falsity was "implausible" and at odds with "common sense." *Id.* at *28–29. So too here: No reasonable consumer would believe that Tylenol PM promises no risk of addiction following "frequent use over a prolonged period," AC ¶ 43, particularly when the label specifically directs consumers ***not*** to use Tylenol PM in excess of 50 mg once a day, or for more than two weeks.

Finally, Plaintiff's bare allegation that he personally "develop[ed] a habit" after using Tylenol PM cannot rescue the Amended Complaint. AC ¶¶ 13, 16. Preliminarily, Plaintiff does not provide any details about the "habit" he supposedly developed, or which of his definitions of "habit" (*i.e.*, regular use or involuntary behavior) describe his own experience. *Id.* ¶ 40. In any event, his "allegations of [] personal experience . . . are insufficient to establish that Defendant's representation is false," particularly where those allegations "lack sufficient detail." *Martin v. Onnit Labs Inc.*, 2023 WL 8190712, at *6 (citing *Tubbs v. AdvoCare Int'l, L.P.*, 785 Fed. App'x 396, 396 (9th Cir. 2019) (affirming dismissal because "Plaintiffs' anecdotal evidence, standing alone, is insufficient to create an inference of falsity"); *see also Aloudi*, 729 F. App'x at 517 (allegations based on anecdotal

- 18 -
Kenvue's Motion to Dismiss the Amended Complaint  [Fed. R. Civ. Pro. 12(b)(6)]

evidence, unaccompanied by "sufficient plausible and specific factual allegations," do not "show the actual falsity of the representation"). Because Plaintiff does not, and cannot, allege that Tylenol PM is habit-forming when taken as directed, he has failed to plausibly plead the "non-habit forming" labeling statement is false or misleading.

II.     **ANY CLAIM THAT TYLENOL PM IS FALSELY LABELED AS SAFE IS INADEQUATELY PLEADED AND EXPRESSLY PREEMPTED**

Plaintiff also alleges the "non-habit forming" labeling statement falsely promises that Tylenol PM is "safe" and causes no "negative health outcomes." AC ¶¶ 16, 47. He fails to explain why consumers would interpret "non-habit forming" as a blanket statement about safety. But even if such a safety message could be imputed, Plaintiff's challenge to it is expressly preempted by federal law.

The Amended Complaint alleges that "diphenhydramine poses a variety of safety risks," AC ¶¶ 43, 47, ranging from dementia, to cardiac toxicity, to "[n]ext day hang over effect." *id.* ¶¶ 29-30. Plaintiff also alleges that diphenhydramine is at times "involved" in drug overdoses, and describes the symptoms of an overdose among children. *Id.* ¶¶ 27-28. But Plaintiff fails to explain how any of these various alleged health outcomes render the "non-habit forming" statement false or misleading. *See Red v. Kraft Foods, Inc.*, No. 10-CV-1028, 2012 WL 5504011, at \*3 (C.D. Cal. Oct. 25, 2012) (reasonable consumers do not "assume things about [a] product[] *other than* what the statement actually says") (citation omitted). Accordingly, Plaintiff has failed to plausibly allege how or why "non-habit forming" conveys a general safety message that is false.

In any event, to the extent that Plaintiff alleges that Tylenol PM's label falsely communicates that the product or its diphenhydramine ingredient is safe, that claim is squarely preempted by federal law. Specifically, Section 379r(a) of the Federal Food, Drug, and Cosmetic Act preempts any attempt to use state law claims to establish a labeling requirement for drugs that is "that is different from or in addition to, or that is otherwise not identical with" those established by federal law. 21 U.S.C. § 379r(a); *see also Smith*, 660 F. Supp. 3d at 872 ("[R]egardless of the source of state law, and regardless of whether the alleged misrepresentation appears in the label, on the packaging, or in

- 19 -
Kenvue's Motion to Dismiss the Amended Complaint  [Fed. R. Civ. Pro. 12(b)(6)]

advertisements elsewhere, Section 379r preempts state law claims to the extent those claims would effectively require a manufacturer to include additional or different information on a federally approved label.") (citations and internal quotation marks omitted).

Here, federal law—the Monograph itself—specifically recognizes that nighttime sleep aids with diphenhydramine hydrochloride that comply with the Monograph are "***generally recognized as safe and effective [as nighttime sleep aids]***." M010.1 (emphasis added); *see also* 21 C.F.R. § 330.1. This recognition followed from FDA's determination that diphenhydramine hydrochloride "in a dose of 50 mg *is safe and effective*," and that "there were no unresolved safety or effectiveness issues." 54 Fed. Reg. at 6,824-25 (emphasis added). Tylenol PM undisputedly complies with the Monograph's requirements, and Plaintiff does not even attempt to allege otherwise. Plaintiff's claim that Tylenol PM and diphenhydramine are nevertheless "unsafe" is therefore "fundamentally at odds with the FDA's monograph" and "an attack on the FDA's determination" that such sleep-aids that comply with the Monograph are "safe and effective." *Howard v. Alchemee, LLC*, No. 24-CV-1834, 2024 WL 4272931, at *7 (C.D. Cal. Sept. 19, 2024) (dismissing as preempted claim that monograph-regulated OTC drug was "unsafe"). Plaintiff cannot seek to impose liability under state law for a (supposed) representation of "safety" expressly permitted by the Monograph. As this would necessarily impose "additional" or "different" requirements on manufacturers beyond those created by federal law, it is plainly preempted by Section 379r.

## III.    THE MULTI-STATE CLASS CLAIMS FAIL FOR LACK OF STATUTORY STANDING

Plaintiff brings claims on behalf of a putative multi-state class composed of consumers who purchased Tylenol PM in ten states. AC ¶ 56. However, the only claims he asserts on behalf of that putative multi-state class are claims under California's consumer protection statutes, the UCL and CLRA. *Id.* ¶¶ 65, 79. Those putative class members lack statutory standing to bring such claims.

California law is clear that when a purchaser is not a California resident, the purchase was not made in California, and the challenged advertisement did not emanate from California, there is no

- 20 -

Kenvue's Motion to Dismiss the Amended Complaint  [Fed. R. Civ. Pro. 12(b)(6)]

statutory standing to bring claims under the UCL and CLRA. *Wilson v. Frito-Lay N. Am., Inc.*, 961 F. Supp. 2d 1134, 1148 (N.D. Cal. 2013) (holding "there is no plausible way for a non-California citizen who purchased Defendant's Products outside California to bring [false advertising] claims" under the UCL or CLRA); *see also Gentges v. Trend Micro Inc.*, No. 11-CV-5574, 2012 WL 2792442, at *6 (N.D. Cal. July 9, 2012) (collecting decisions that "have concluded that the UCL and CLRA do not reach claims of non-California residents arising from conduct occurring entirely outside of California). The non-California purchasers who comprise the putative multi-state class, AC ¶ 56, fail to satisfy these criteria. They do not live in California, nor did they purchase Tylenol PM in California. And while those statutes may "be applied extraterritorially where the unlawful conduct that forms the basis of the out-of-state plaintiff's claim occurs in California," *Fontenberry v. MV Transp.., Inc.*, 984 F. Supp. 2d 1062, 1067 (E.D. Cal. 2013), Kenvue has no offices or facilities related to Tylenol products in California, AC ¶ 18, nor is there any allegation that the labeling of, or the decision to label, Tylenol PM as "non-habit forming" occurred in California. Accordingly, the multi-state class's claims must be dismissed for lack of statutory standing under the UCL and CLRA.

## IV.    THE AMENDED COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE

The Amended Complaint not only fails to plead any evidence to disprove the "non-habit forming" statement, but its core theory also defies FDA's determinations and decades of scientific research regarding diphenhydramine. This defect cannot be cured by amendment, rendering leave to amend futile. *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000). Indeed, courts have found that "[i]n the context of label-based claims," dismissal with prejudice at the pleadings stage is proper where, as here, "the label itself is accurate and does not contradict other representations and inferences on the product's packaging, and 'no other words, pictures, and diagrams' on the packaging create a misleading impression." *See Hartwich v. Kroger Co.*, No. 20-CV-1253, 2021 WL 4519019, at *5 (C.D. Cal. Sept. 20, 2021) (quoting *Ebner*, 838 F.3d at 966). That result is warranted here, and the Amended Complaint should be dismissed with prejudice.

**CONCLUSION**

For the foregoing reasons, the Amended Complaint should be dismissed with prejudice and without leave to amend.

Dated: December 23, 2024

Respectfully submitted,

*/s/ Steven A. Zalesin*

Steven A. Zalesin *(pro hac vice)*
Joshua Kipnees *(pro hac vice)*
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
Tel: (212) 336-2000
Fax: (212) 336-2111
sazalesin@pbwt.com
jkipnees@pbwt.com

Malcolm Segal (SBN 075481)
SEGAL & ASSOCIATES, PC
500 Capitol Mall, Suite 600
Sacramento, CA  95814
Telephone: (916) 441-0886
msegal@segal-pc.com

- 22 -
Kenvue's Motion to Dismiss the Amended Complaint  [Fed. R. Civ. Pro. 12(b)(6)]