Malcolm Segal (SBN 075481)
**Segal & Associates, PC**
500 Capitol Mall, Suite 600
Sacramento, CA  95814
Telephone: (916) 441-0886
msegal@segal-pc.com

Steven A. Zalesin (admitted *pro hac vice*)
Joshua Kipnees (admitted *pro hac vice*)
**Patterson Belknap Webb & Tyler LLP**
1133 Avenue of the Americas
New York, NY 10036
Telephone: (212) 336-2000
sazalesin@pbwt.com
jkipnees@pbwt.com

Attorneys for Defendant

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SIRREON GOODSON, individually and on behalf of all others similarly situated, | Civil Action No. 24-cv-03152-DC -JDP |
| Plaintiff, | **DEFENDANT KENVUE BRANDS LLC'S REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF ITS MOTION TO DISMISS AMENDED COMPLAINT [Fed. R. Civ. Pro. 12(b)(6)]** |
| v. | |
| KENVUE BRANDS LLC, | |
| Defendant. | Date: March 21, 2025<br>Time: 1:30 p.m.<br>Crtrm: 8, 13th Floor<br>Judge: Hon. Dena Coggins |

- i -
Kenvue's Reply Memorandum of Points and Authorities in Further Support of its Motion to Dismiss the Amended Complaint [Fed. R. Civ. Pro. 12(b)(6)]

## **TABLE OF CONTENTS**

**Page**

INTRODUCTION .................................................................................................................1

ARGUMENT .......................................................................................................................2

I.     PLAINTIFF ABANDONS HIS INAPT DEFINITION OF "HABIT-FORMING"..................2

II.    THE AC FAILS TO PLEAD THAT TYLENOL PM IS "HABIT-FORMING"......................4

III.   PLAINTIFF'S ASSERTION THAT REASONABLE TYLENOL PM USERS DO
       NOT READ DIRECTIONS SHOULD BE REJECTED.............................................7

IV.    PLAINTIFF HAS CONCEDED ANY CLAIM THAT TYLENOL PM IS UNSAFE
       IS PREEMPTED......................................................................................9

V.     THE CLAIMS OF NON-CALIFORNIA MEMBERS OF THE MULTI-STATE
       CLASS ARE PROPERLY DISMISSED AT THIS STAGE ....................................9

VI.    LEAVE TO AMEND WOULD BE FUTILE..........................................................12

CONCLUSION....................................................................................................................12

Kenvue's Reply Memorandum of Points and Authorities in Further Support of its Motion to Dismiss
the Amended Complaint [Fed. R. Civ. Pro. 12(b)(6)]

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alvarez v. NBTY, Inc.*,
No. 17-cv-567 (BAS) (BGS), 2017 WL 6059159 (S.D. Cal. Dec. 6, 2017) ...........................11

*Barnes v. Campbell Soup Co.*,
No. 12-cv-5185 (JSW), 2013 WL 5530017 (N.D. Cal. July 25, 2013) ...................................4

*BBL, Inc. v. City of Angola*,
809 F.3d 317 (7th Cir. 2015) .................................................................................................12

*Becerra v. Dr Pepper/Seven Up, Inc.*,
945 F.3d 1225 (9th Cir. 2019) .................................................................................................4

*Chong v. Nestlé Waters N. Am., Inc.*,
No. 19-cv-10901 (DMG), 2020 WL 7690175 (C.D Cal. Nov. 30, 2020) ..........................4, 10

*Eckler v. Wal-Mart Stores, Inc.*,
No. 12-cv-727 (LAB) (MDD), 2012 WL 5382218 (S.D. Cal. Oct. 31, 2012) .........................7

*Engram v. GSK Cons. Healthcare Holdings (US) Inc.*,
No. 19-cv-2886 (EK) (PK), 2021 WL 4502439 (E.D.N.Y. Sept. 30, 2021) ............................8

*Forrett v. Gourmet Nut, Inc.*,
634 F. Supp. 3d 761 (N.D. Cal. 2022) ....................................................................................3

*Forsher v. Boar's Head Provisions Co.*,
No. 17-cv-4974 (CW), 2018 WL 11436306 (N.D. Cal. Sept. 14, 2018)................................11

*Franklin v. Midwest Recovery Sys., LLC*,
No. 18-cv-2085 (JLS) (DFM), 2020 WL 3213676 (C.D. Cal. Mar. 9, 2020) ........................12

*Genexa, Inc. v. KinderFarms LLC*,
No. 22-cv-9291 (MWF), 2023 U.S. Dist. LEXIS 65979 (C.D. Cal. Apr. 14, 2023).................8

*Kemsley v. Brennan*,
831 F. App'x 865 (9th Cir. 2020).............................................................................................13

*Kwan v. SanMedica Int'l*,
854 F.3d 1088 (9th Cir. 2017) .................................................................................................7

*La Barbera v. Olé Mexican Foods Inc.*,
No. 20-cv-2324 (JGB), 2023 WL 4162348 (C.D. Cal. May 18, 2023) ..................................13

*McFall v. Perrigo Co.*,
No. 20-cv-7752 (FLA), 2021 WL 2327936 (C.D. Cal. Apr. 15, 2021).............................11, 12

*McGinity v. Procter & Gamble Co.*,
69 F.4th 1093 (9th Cir. 2023) .................................................................................................9

*Melendres v. Arpaio*,
784 F.3d 1254 (9th Cir. 2015) ...............................................................................................11

Kenvue's Reply Memorandum of Points and Authorities in Further Support of its Motion to Dismiss the Amended Complaint [Fed. R. Civ. Pro. 12(b)(6)]

*Mirabadi v. Select Portfolio Serv., Inc.*,
    No. 23-cv-6809 (PSG) (SP), 2024 WL 1151673 (C.D. Cal. Feb. 13, 2024) .............................5

*Moore v. Trader Joe's Co.*,
    4 F.4th 874 (9th Cir. 2021) .........................................................................................4, 7

*Patterson v. RW Direct, Inc.*,
    No. 18-cv-55 (VC), 2018 WL 6106379 (N.D. Cal. Nov. 21, 2018).......................................11

*Robles v. GOJO Indus., Inc.*,
    No. 22-55627, 2023 WL 4946601 (9th Cir. Aug. 3, 2023) ........................................................7

*Sullivan v. Oracle Corp.*,
    51 Cal. 4th 1191 (2011) ...............................................................................................11

*Swearingen v. Late July Snacks LLC*,
    No. 13-cv-04324 (EMC), 2017 WL 1806483 (N.D. Cal. May 5, 2017) ...........................11, 12

*Vicente v. Cakes Body, LLC*,
    No. 24-cv-2797 (VC), 2024 WL 4375773 (N.D. Cal. Oct. 2, 2024).......................................8

*Weiss v. Trader Joe's*,
    838 F. App'x 302 (9th Cir. 2021) ..................................................................................9

**Statutes**

California Civil Code § 1785.25(a) ................................................................................12

**Other Authorities**

21 C.F.R. § 201.66(c).....................................................................................................9

*Nighttime Sleep-Aid Drug Products for Over-the-Counter Human Use; Final
    Monograph*, 54 Fed. Reg. 6,814, 6,824-25(Feb. 14, 1989) .................................................10

*Over-the-Counter Nighttime Sleep-Aid and Stimulant Products*, 43 Fed. Reg. 25,544,
    25-545-46 (June 13, 1978)..............................................................................................5

Kenvue's Reply Memorandum of Points and Authorities in Further Support of its Motion to Dismiss the Amended Complaint [Fed. R. Civ. Pro. 12(b)(6)]

**INTRODUCTION**

Plaintiff's Opposition (Dkt. 25) reveals that even he does not believe that his pleaded interpretation of "non-habit forming" is reasonable.  The term "habit-forming" is defined by dictionaries to mean something that causes addiction or abuse.  In the context of over-the-counter drug products such as Tylenol PM (the "Products"), any reasonable consumer would understand that statement accordingly.  Plaintiff's decision not to defend the Amended Complaint's ("AC") interpretation, which relies on the most general definitions of the word "habit," illustrates the absurdity of that construction.  It is also a procedurally impermissible attempt to amend the AC's allegations in an opposition brief, and a tacit admission that the AC cannot state a claim.

In any event, Plaintiff's pivot does not render his claims any more viable.  The AC is devoid of well-pleaded factual allegations that the Products, when used as directed, are likely to cause addiction or abuse.  This is plain on the face of the scientific articles on which the AC purports to rely.  Each describes use of the Products' active ingredient, diphenhydramine, in a manner completely inconsistent with the Products' FDA-mandated label directions for use—*i.e.*, (i) at dosages far in excess of the directed 50 mg daily maximum, (ii) for periods far longer than the directed two-week maximum duration, (iii) for purposes other than as a sleep-aid, and/or (iv) when administered intravenously rather than via oral tablet.  None of the studies describe diphenhydramine use at doses, durations, and frequencies remotely close to those directed on the Product labels.

In a final attempt to salvage the AC, Plaintiff argues that reasonable consumers would ignore these label directions because they appear on the side and back of Tylenol PM's packaging, and because a consumer who is already addicted cannot be expected to follow directions for use.  This assertion ignores that—as numerous courts have recognized—reasonable consumers consider context and common sense when reviewing labeling statements, and read the directions for use, particularly when the product is a medication.  Further, Plaintiff's argument that addicted consumers cannot follow the directions illogically presumes that they have become addicted before they can review the directions even once—an absurd claim that finds no support in Plaintiff's allegations or the scientific studies cited in the AC.

Kenvue's Reply Memorandum of Points and Authorities in Further Support of its Motion to Dismiss the Amended Complaint [Fed. R. Civ. Pro. 12(b)(6)]

These defects alone warrant dismissal of the AC in its entirety, but the Opposition also fails to meaningfully address other problems with Plaintiff's allegations.  Plaintiff disavows any claim based on the AC's allegations that Tylenol PM is unsafe, confirming that such claims should be dismissed. Further, Plaintiff fails to explain how putative multi-state class members who admittedly purchased Tylenol PM in other states could ever have standing to bring claims under California consumer protection statutes—the only claims asserted on behalf of that class.  Plaintiff's proposal that the Court defer resolution of this issue until the class certification stage is as incorrect as it is inefficient, as these individuals' lack of standing to bring California claims is clear from the face of the AC.

**ARGUMENT**

**I.      PLAINTIFF ABANDONS HIS INAPT DEFINITION OF "HABIT-FORMING"**

The Opposition does not attempt to defend the AC's definition of non-habit forming.  Instead, it espouses a new definition, and disingenuously argues that this revised interpretation is "consistent" with that set forth in the AC.  Opp. at 2.  Plaintiff's effort to retool his allegations through his Opposition underscores that the interpretation pleaded in the AC is implausible, and that even Plaintiff is not prepared to defend it.

The AC alleged that reasonable consumers interpret "non habit-forming" on Tylenol PM's label based on the "ordinary and common usage of the term 'habit'"—*i.e.*, an action that is "usual" or "do[ne] often and regularly," or a "motorically reflexive" behavior conducted "with little or no conscious intent."  AC ¶ 40 & n.1.  Because consumers could develop a "nightly routine" of taking Tylenol PM, the AC alleged, the "'non habit-forming' claim is false."  *Id.* ¶ 43.  Consistent with this interpretation, Plaintiff alleged that the "'non habit-forming' claim" deceived him because "when [he] took the [p]roduct as directed …, he developed a habit" of taking Tylenol PM.  AC ¶¶ 16, 40.

In response to the AC's inapt definition, Kenvue Brands LLC's ("Kenvue") Opening Brief (Dkt. 20) showed that, consistent with the ordinary understanding and dictionary definitions, and particularly in the context of drugs, the only reasonable interpretation of "non-habit forming" on Tylenol PM's label is that the product does not cause addiction or abuse when used as directed.  Open. Br. at 14 (citing dictionary definitions).

- 2 -
Kenvue's Reply Memorandum of Points and Authorities in Further Support of its Motion to Dismiss the Amended Complaint [Fed. R. Civ. Pro. 12(b)(6)]

Confronted with the absurdity of claiming a "non-habit forming" OTC drug promises no "regular" or "motorically reflexive" use, the Opposition does not even attempt to defend these allegations.  Instead, the Opposition tries to artfully adopt Kenvue's definition and distance itself from the AC's, arguing that the interpretations alleged in the AC "are consistent with" a definition of "habit-forming" that means "causing or likely to cause addiction or abuse."  Opp. at 7, 9-10.

Plaintiff's assertion that "regular use" is a definition "consistent" with "addiction" is implausible on its face.  Simply put, Plaintiff's pleaded definitions as "something that you do often and regularly," or of automatic, unconscious behavior, AC ¶ 40, has nothing to do with the concept of addiction formation.   Courts have rejected similar efforts to falsely conflate unreasonable interpretations of labeling claims with the definitions advanced by defendants in a motion to dismiss. For example, in *Rugg v. Johnson & Johnson*, plaintiffs alleged that customers would understand "hypoallergenic" to mean the challenged products contained no ingredient that, at any concentration, could "sensitize" the skin or produce any other sort of "negative reaction."  No. 17-cv-5010 (BLF), 2018 WL 3023493, at *2-3 (N.D. Cal. June 18, 2018).  When defendant's motion to dismiss noted that hypoallergenic has a specific dictionary definition—*i.e.*, "unlikely to cause an allergic reaction"— plaintiffs argued that this definition was "not substantively different" from the one they had pleaded. *Id.*  The court disagreed, noting that "the definition set forth in the [complaint] appears to be wholly unrelated to the concept of allergic reaction … at the heart of the dictionary definitions," and concluded as a matter of law that no reasonable consumer would interpret the statement as plaintiffs alleged.  *Id.*; *see also Forrett v. Gourmet Nut, Inc.*, 634 F. Supp. 3d 761, 765 (N.D. Cal. 2022) (rejecting new theory of mislabeling raised in opposition brief because "Plaintiff may not use his opposition to raise and argue new allegations or claims not in the complaint").  So too here:  Plaintiff's alleged interpretations of "non-habit forming" are "wholly unrelated to the concept" of addiction and abuse that "are at the heart of the dictionary definitions," and the Opposition does not even attempt to harmonize them. Thus, as in *Rugg*, Plaintiff's transparent effort to conflate his implausible interpretation with a reasonable one underscores that his claims are ripe for dismissal.

Even Plaintiff acknowledges this Court may find his pleaded definition is "inconsistent" with

- 3 -

Kenvue's Reply Memorandum of Points and Authorities in Further Support of its Motion to Dismiss the Amended Complaint [Fed. R. Civ. Pro. 12(b)(6)]

his new definition. Opp. at 7 n.1. But he makes no effort to defend the former, thereby waiving any reliance on it. *Chong v. Nestlé Waters N. Am., Inc.*, No. 19-cv-10901 (DMG) (KSx), 2020 WL 7690175, at *9 (C.D Cal. Nov. 30, 2020). Plaintiff claims that his pleaded definition is "plausible," Opp. at 7 n.1, but fails to explain why a reasonable consumer would understand "habit-forming" in the manner that even Plaintiff now disavows, and is contrary to the relevant dictionary definitions. Open. Br. at 14. Ultimately, Plaintiff's shifting position shows that the AC does not plead a definition of "non-habit forming" that reasonable consumers would share. This is precisely the type of unreasonable interpretation of labeling claims that courts routinely dismiss at the pleading stage. *See, e.g.*, *Becerra v. Dr Pepper/Seven Up, Inc.*, 945 F.3d 1225, 1228-30 (9th Cir. 2019) (affirming dismissal of claims "based on … unreasonable assumptions" about what labeling statements mean, and recognizing that, to state a claim for false advertising under California consumer protection laws, plaintiff must sufficiently allege "more than a mere possibility that [the statement] might conceivably be misunderstood by [a] few consumers viewing it in an unreasonable manner"); *see also Moore v. Trader Joe's Co.*, 4 F.4th 874, 882 (9th Cir. 2021) ("[A] plaintiff's unreasonable assumptions about a product's label will not suffice" to support allegations that the label deceives reasonable consumers).

In short, Plaintiff's failure to defend his allegations of how reasonable consumers interpret "non habit-forming" is reason alone to dismiss his claims. Plaintiff cannot simply switch to a new theory of mislabeling in his motion to dismiss briefing. *Barnes v. Campbell Soup Co.*, No. 12-cv-5185 (JSW), 2013 WL 5530017, at *2 (N.D. Cal. July 25, 2013) ("Plaintiffs cannot unilaterally use their Opposition as an opportunity to amend and raise new arguments to cure deficiencies in their Complaint."); *Mirabadi v. Select Portfolio Serv., Inc.*, No. 23-cv-6809 (PSG) (SP), 2024 WL 1151673, at *7 n.3 (C.D. Cal. Feb. 13, 2024) ("Plaintiffs cannot amend their complaint in opposition to a motion to dismiss.").

## II.    THE AC FAILS TO PLEAD THAT TYLENOL PM IS "HABIT-FORMING"

Even if Plaintiff had properly alleged an interpretation of "non-habit forming" that is consistent with common understanding and dictionary definitions, the AC is wholly devoid of well-pleaded allegations that use of the Products as directed is likely to cause addiction or abuse.

- 4 -

Kenvue's Reply Memorandum of Points and Authorities in Further Support of its Motion to Dismiss the Amended Complaint [Fed. R. Civ. Pro. 12(b)(6)]

In an effort to locate support in the AC for this assertion, Plaintiff looks to the scientific studies cited therein. Opp. at 5, 8. Because the AC and Opposition rely on these studies to attempt to establish that the Products are "habit-forming," the Court can and should consider the actual contents of the studies, rather than Plaintiff's mischaracterizations of them. Open. Br. at 17-18 (collecting cases).

On their face, those articles do not contradict the statement that Tylenol PM is non-habit forming. As mandated by FDA's labeling requirements for nighttime sleep aids such as the Products, the directions for use on Tylenol PM's label instruct consumers to "take 2 caplets," for a total of 50 mg of diphenhydramine, per day, and to "[s]top use and ask a doctor" if sleeplessness persists after two weeks. Ex. A to Kipnees Decl. As the U.S. Food and Drug Administration ("FDA") has concluded, diphenhydramine in such "limited" quantities has "low abuse potential and no ability to create dependency." *Over-the-Counter Nighttime Sleep-Aid and Stimulant Products*, 43 Fed. Reg. 25,544, 25-545-46 (June 13, 1978). By contrast, all of the scientific articles cited in the AC discuss diphenhydramine use at significantly higher dosages, at more frequent intervals and/or longer durations, and/or using different methods of delivery (such as intravenous administration) than directed on Tylenol PM's label. Open. Br. at 15-17.

Faced with this glaring discrepancy, the Opposition resorts to misstating or mischaracterizing the contents of three studies cited in the AC. Plaintiff claims that one such study, *Tolerance to Daytime Sedative Effects of H1 Antihistamines*, "confirms that diphenhydramine is habit-forming with regular use." Opp. at 5, 8. But this article says nothing of the sort. Rather, the authors observed that some individuals taking twice the FDA-mandated dosage developed "***tolerance***" to diphenhydramine, meaning reduced "sleepiness," but concluded that "it remains to be determined whether tolerance develops to the sedation … and, if so, over what time course." Ex. K to Kipnees Decl. at 1-2. As the AC itself acknowledges, tolerance is not addiction. AC ¶ 7. This article says nothing about ***addiction*** potential, let alone addiction risk when used at the directed dosage.

Next, Plaintiff contends that the *Risk of Abuse of Diphenhydramine in Children and Adolescents with Chronic Illnesses* article demonstrates that "diphenhydramine users quickly build tolerance to the ingredient, leading to increased intake and difficulty quitting." Opp. at 5, 8. Again, as the

- 5 -

Kenvue's Reply Memorandum of Points and Authorities in Further Support of its Motion to Dismiss the Amended Complaint [Fed. R. Civ. Pro. 12(b)(6)]

AC acknowledges, tolerance and addiction are not the same. AC ¶ 7. Moreover, this study discusses diphenhydramine use that bears no resemblance to that directed by Tylenol PM's label. Rather, it discusses administration of diphenhydramine (a) to treat "hematologic and oncologic problems," not sleeplessness; (b) intravenously, not orally; (c) at dosages far in excess of the 50 mg daily maximum; (d) at a frequency far greater than once a day; (e) for a duration far longer than two weeks; *and* (f) by members of an age group (children under 12 years) that that the Tylenol PM label specifically instructs, "do not use." *See* Ex. E to Kipnees Decl. For example, one patient (an 8-year-old) took a 50 mg dose "every 1½ to 2 hours" for an unknown period, and another "was treated extensively" with diphenhydramine for "years." *Id.* at 1-2. None of the patients used OTC products, and the prescribed treatments (administered "intravenous[ly]" or by injections for "a prolonged period") were for "chronic illness," not as a sleep aid. *Id.* at 2.

Finally, Plaintiff's mischaracterization of *Severe Diphenhydramine Dependence and Withdrawal: Case Report* may be the most egregious of all. Plaintiff claims that this article "confirms … withdrawal symptoms" among "frequent diphenhydramine users." Opp. at 8. But what it actually discusses is a single patient who used *1.5 grams* of diphenhydramine per day—*30 times* the FDA-mandated dosage for over-the-counter sleep aids. Ex. B to Kipnees Decl. at 2.

Plaintiff contends the AC need not "support his … claims with irrefutable scientific evidence." Opp. at 7. But as even he recognizes, reliance on scientific studies cannot rescue a complaint where the studies have no bearing on "the representation at issue." Opp. at 7, 9; *see also* Open. Br. at 17-18 (citing decisions granting dismissal where cited studies did not "plausibly debunk" labeling statements). Here, the studies on their face do not align with what Plaintiff alleges or argues in his Opposition. As a result, Plaintiff has failed to plausibly allege that those studies "affirmatively disprov[e]" that Tylenol PM, taken as directed, is "non-habit forming." *Kwan v. SanMedica Int'l*, 854 F.3d 1088, 1091 (9th Cir. 2017); *Eckler v. Wal-Mart Stores, Inc.*, No. 12-cv-727 (LAB) (MDD), 2012 WL 5382218, at *6 (S.D. Cal. Oct. 31, 2012) (dismissing claims where complaint's reliance on studies that do not "show what [plaintiff] claims they do" left court with "no facts from which to infer that [defendant] is liable for false advertising").

Kenvue's Reply Memorandum of Points and Authorities in Further Support of its Motion to Dismiss the Amended Complaint [Fed. R. Civ. Pro. 12(b)(6)]

### III.    PLAINTIFF'S ASSERTION THAT REASONABLE TYLENOL PM USERS DO NOT READ DIRECTIONS SHOULD BE REJECTED

Because the AC fails to plead facts that plausibly support the contention that Tylenol PM is "non-habit forming" when taken as directed, the Opposition attempts to dismiss the product's FDA-mandated directions for use as "a red herring." Opp. at 10. According to the Opposition, reasonable consumers cannot be expected to read such warnings and directions on the labels of OTC drugs, and in any event, any Tylenol PM user who is already addicted cannot be expected to follow those warnings and directions. Opp. at 8-10. Both arguments are meritless.

As the Ninth Circuit has recognized, when reviewing a product label, reasonable consumers consider "all the information available to [them] and the context in which that information is provided and used." *Moore*, 4 F.4th at 882. They are further informed by "[g]eneral knowledge and common sense." *Robles v. GOJO Indus., Inc.*, No. 22-55627, 2023 WL 4946601, at *2 (9th Cir. Aug. 3, 2023). For OTC drugs in particular, consumers "[are] accustomed to seeing the FDA-mandated 'Directions' on the back of an over-the-counter product," and to following those directions when using the drug. *Engram v. GSK Cons. Healthcare Holdings (US) Inc.*, No. 19-cv-2886 (EK) (PK), 2021 WL 4502439, at *5 (E.D.N.Y. Sept. 30, 2021). It is "implausible," if not "impossib[le]," that a reasonable consumer would interpret statements on the labels of OTC drugs in direct defiance of the dosage instructions or warnings. *Genexa, Inc. v. KinderFarms LLC*, No. 22-cv-9291 (MWF) (SKx), 2023 U.S. Dist. LEXIS 65979 (C.D. Cal. Apr. 14, 2023); Ex. S to Kipnees Decl. (official FDA website affirming that "[r]eading the product label is the most important part of taking care of yourself or your family when using nonprescription medicines," especially "because they can be taken without seeing a doctor").

Tellingly, the Opposition fails to cite a single case that holds that reasonable consumers simply ignore the directions and warnings on medications (OTC or otherwise). *See* Opp. at 9-10. Instead, Plaintiff unsuccessfully tries to distinguish Kenvue's authorities. For example, he argues that the *Genexa* hinged on the fact that the "non-toxic" statement appeared on "the back of the box" and "above the drug facts panel." Opp. at 10. But he ignores that the court found plaintiff's interpretation "implausible" based on "the contextual clues provided by the packaging itself" and "the reality and

- 7 -

Kenvue's Reply Memorandum of Points and Authorities in Further Support of its Motion to Dismiss the Amended Complaint [Fed. R. Civ. Pro. 12(b)(6)]

common sense understanding of the nature of the Product." *Genexa*, 2023 U.S. Dist. LEXIS 65979, at \*28-29. Such an interpretation defied the overall "messaging conveyed by the packaging," confirmed by the "back panel warnings" and dosing instructions, that the product "must be taken at prescribed dosages." *Id.* at \*26-27. The same reasoning applies with equal force here.

Plaintiff next claims that expecting consumers to read directions for use is akin to requiring them to "learn the truth from disclaimers in fine print." Opp. at 10 (citing *Vicente v. Cakes Body, LLC*, No. 24-cv-2797 (VC), 2024 WL 4375773, at \*1 (N.D. Cal. Oct. 2, 2024)). This analogy does not withstand even basic scrutiny. The FDA-mandated directions and warnings—familiar to any user of over-the-counter medications—are not some mouse print "disclaimer." They cover the entire side and back panels of the Product labels. Ex. A to Kipnees Decl. Further, the FDA evidently does not share Plaintiff's concern that consumers will ignore those prominent instructions, as the detailed requirements for over-the-counter drug labels permit inclusion of directions and warnings anywhere on the "outside container or wrapper." 21 C.F.R. § 201.66(c). "[A] reasonable consumer does not check her common sense at the door." *Weiss v. Trader Joe's*, 838 F. App'x 302, 303 (9th Cir. 2021).

In any event, even if the FDA-mandated instructions were as meaningless as Plaintiff contends, "the front label must be unambiguously deceptive for a defendant to be precluded from insisting that the back label be considered." *McGinity v. Procter & Gamble Co.*, 69 F.4th 1093, 1097-98 (9th Cir. 2023) (holding that if a challenged front-label claim is ambiguous, reasonable consumers would consult the back and side labels). Plaintiff has neither pleaded nor attempted to argue that the "non habit-forming" front label claim "unambiguously deceives" consumers into believing they can ignore the Products' directions for use with impunity and expect no risk of abuse no matter the dosage, frequency, or duration of use. Indeed, Plaintiff himself alleges that he used the Products "as directed." AC ¶ 16. He is therefore in no position to argue that the warnings and directions on the side and back labels are irrelevant to reasonable consumers.

Finally, Plaintiff's contention that "consumers are unable to follow" the label directions to stop use after two weeks "*because* Tylenol PM is habit forming," Opp. at 10 (emphasis in original), fares no better. This argument assumes that there is no point at which consumers can or should read the

- 8 -

label instructions before they have developed an addiction to diphenhydramine. Not only is this unsupported by any allegation in the AC, but it is also totally implausible. Plaintiff fails to explain how consumers could become addicted to Tylenol PM at any relevant time point, such as the point of purchase, when they are first presented with the label instructions; before taking their initial dose of Tylenol PM; or within the two-week maximum use directed by the label. At each of these points, well prior to developing "habitual use" according to the AC, consumers have had ample opportunity to read and follow the label directions—and in turn, avoid the effects that allegedly come with use that defies those directions. Moreover, Plaintiffs' suggestion that consumers are somehow innately addicted to Tylenol PM flies in the face of FDA's conclusions that nighttime sleep-aids like Tylenol PM are "safe and effective," and that "a recommended dose of 50 mg" is not "likely to become a serious risk to public health through abuse." *Nighttime Sleep-Aid Drug Products for Over-the-Counter Human Use; Final Monograph*, 54 Fed. Reg. 6,814, 6,824-25 (Feb. 14, 1989).

## IV.    PLAINTIFF HAS CONCEDED ANY CLAIM THAT TYLENOL PM IS UNSAFE IS PREEMPTED

Plaintiff abandons any claim premised on the AC's allegations that diphenhydramine poses "safety risks." AC ¶¶ 25-31. Instead, Plaintiff calls these allegations "irrelevant," and does not dispute that such a claim would be preempted by federal law. Opp. at 2. Accordingly, this Court should dismiss any claim premised on the theory that Tylenol PM is falsely marketed as safe and effective, or that Tylenol PM is otherwise unsafe. *Chong*, 2020 WL 7690175, at *9.

## V.    THE CLAIMS OF NON-CALIFORNIA MEMBERS OF THE MULTI-STATE CLASS ARE PROPERLY DISMISSED AT THIS STAGE

As Kenvue explained in its Opening Brief, the AC asserts two claims under California statutes on behalf of a putative "multi-state consumer protection class" consisting of "all people who purchased" Tylenol PM in nine states other than California. AC ¶¶ 56, 65, 79.[1] No other claims are asserted on behalf of this putative class, and no there is no allegation of any connection between these

---

[1] The multi-state consumer protection class also includes people who purchased the product in California.

Kenvue's Reply Memorandum of Points and Authorities in Further Support of its Motion to Dismiss the Amended Complaint [Fed. R. Civ. Pro. 12(b)(6)]

putative class members, their purchases, and the state of California. To the contrary, the AC specifically alleges that such class members did not purchase the Products in California. *Id.* ¶ 56. The AC further concedes that Kenvue has neither its headquarters nor its principal place of business in California. AC ¶ 18.

Based on these allegations, it is clear on the face of the AC that the putative multi-state class members cannot state claims under California law. "In such cases," courts have dismissed class claims where "it is clear from the pleadings that class claims cannot be maintained." *Swearingen v. Late July Snacks LLC*, No. 13-cv-04324 (EMC), 2017 WL 1806483, at *9 (N.D. Cal. May 5, 2017).

The Opposition makes no attempt to justify claims brought under California statutes on behalf of individuals with no connection to the state or interests protected by California law. The "presumption against extraterritoriality" applies to Plaintiff's statutory claims "in full force," and plaintiffs who do not live in California, did not purchase the product in California, and cannot allege that the misleading statements originated from California cannot, under any circumstance, state claims under these statutes. *Sullivan v. Oracle Corp.*, 51 Cal. 4th 1191, 1207 (2011); *see also* Open. Br. at 20-21 (collecting cases). Plaintiff simply argues that resolution of this glaring error is "premature" and must be delayed until class certification. Opp. at 11-13. There is no reason to delay the inevitable.

Plaintiff's timing argument relies entirely on inapposite cases which did not address the dismissal of claims brought by out-of-state class members who could not state a claim under California law. *Melendres v. Arpaio*, 784 F.3d 1254 (9th Cir. 2015), on which Plaintiff relies (Opp. at 11), considered when a district court should assess whether a named plaintiff could sue on behalf of absent class members who suffered similar but not identical injuries, concluding that this issue was a question of adequacy of representation, not one of standing. *Id.* at 1261-62; *see also McFall v. Perrigo Co.*, No. 20-cv-7752 (FLA) (MRWx), 2021 WL 2327936, at *17 n.8 (C.D. Cal. Apr. 15, 2021) (holding that "*Melendres*, however, is inapposite" regarding whether class members with no connection to California can bring claims under California consumer protection laws). Plaintiff's remaining authorities present the opposite issue from this case: a California resident brought claims under ***other*** states' laws on behalf of unnamed class members who resided and were harmed in those states. *See*

- 10 -

Kenvue's Reply Memorandum of Points and Authorities in Further Support of its Motion to Dismiss the Amended Complaint [Fed. R. Civ. Pro. 12(b)(6)]

*Alvarez v. NBTY, Inc.*, No. 17-cv-567 (BAS) (BGS), 2017 WL 6059159, at *7 (S.D. Cal. Dec. 6, 2017) (addressing multi-state class claims brought "under consumer protection laws of states where [named] Plaintiffs neither resided nor purchased the disputed product"); *Patterson v. RW Direct, Inc.*, No. 18-cv-55 (VC), 2018 WL 6106379, at *1 (N.D. Cal. Nov. 21, 2018) (same); *Forsher v. Boar's Head Provisions Co.*, No. 17-cv-4974 (CW), 2018 WL 11436306, at *7 (N.D. Cal. Sept. 14, 2018) (same). Here, Plaintiff asserts no claims under foreign state law, and "do[es] not plead <u>any</u> facts to establish a connection between California and Defendants' relationship with the out-of-state potential class members, the putative class members' purchase of Defendants' products, or any harm the class members may have suffered." *McFall*, 2021 WL 2327936, at *18 (emphasis in original); *see also Swearingen*, 2017 WL 1806483, at *9. Accordingly, there is no need to conduct a choice of law analysis to conclude that the multi-state class members lack standing to bring California statutory claims.

Plaintiff finally argues that a motion to dismiss the improper class claims amounts to a request that "the Court … partially dismiss Plaintiff's claims." Opp. at 12. Not so. Dismissing a putative class's claim because the class members cannot state a claim disposes of their *entire* claim, and courts routinely do so. *See, e.g.*, *McFall*, 2021 WL 2327936, at *18-19 (granting motion to dismiss putative nationwide class claims). Emphasizing this legal principle, none of Plaintiff's authorities address motions to dismiss class claims. *See* Opp. at 12 (citing *Franklin v. Midwest Recovery Sys., LLC*, No. 18-cv-2085 (JLS) (DFM), 2020 WL 3213676, at *1 (C.D. Cal. Mar. 9, 2020) (addressing defendant's "motion to dismiss as to Plaintiffs' UCL claim *except as it relates to* a UCL 'unlawful' claim based upon California Civil Code § 1785.25(a)" (emphasis in original)); *BBL, Inc. v. City of Angola*, 809 F.3d 317, 324-25 (7th Cir. 2015) (addressing district court that "split a single claim into multiple components based on the elements" and "granted the [motion] … on certain elements of that single claim")).

Kenvue's motion to dismiss the multi-state class's claim for lack of statutory standing is a motion to dismiss an entire claim, and is regularly addressed—and granted—by district courts at the pleading stage. *See supra*. The same result should occur here.

- 11 -

Kenvue's Reply Memorandum of Points and Authorities in Further Support of its Motion to Dismiss the Amended Complaint [Fed. R. Civ. Pro. 12(b)(6)]

## VI.    LEAVE TO AMEND WOULD BE FUTILE

Because the statement that Tylenol PM is "non habit-forming" is truthful and accurate, "Plaintiff's claims fail as a matter of law based on an assessment of the [p]roduct[']s packaging as a whole," and any further amendment to the AC would be futile.  *La Barbera v. Olé Mexican Foods Inc.*, No. 20-cv-2324 (JGB) (SPx), 2023 WL 4162348, at *20 (C.D. Cal. May 18, 2023) (dismissing first amended complaint with prejudice).

Plaintiff insists that he "can provide additional allegations regarding … falsity." Opp. at 13. What those allegations might be—or why they were not included in Plaintiff's prior pleadings—is left to the imagination.  This unspecified pledge to plead better facts does not warrant another bite at the apple.  "A plaintiff may not in substance say 'trust me,' and thereby gain a license for further amendment when [provided] prior opportunity to explain those facts." *Kemsley v. Brennan*, 831 F. App'x 865, 866 (9th Cir. 2020) (affirming dismissal of complaint not previously amended).  Given Plaintiff's failure to identify any factual allegations that could make his theory of mislabeling less implausible, dismissal with prejudice is warranted.

<b>CONCLUSION</b>

For the foregoing reasons, the Amended Complaint should be dismissed with prejudice and without leave to amend.

Dated: March 7, 2025

Respectfully submitted,

*/s/ Steven A. Zalesin*

Steven A. Zalesin *(pro hac vice)*
Joshua Kipnees *(pro hac vice)*
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
Tel: (212) 336-2000
Fax: (212) 336-2111
sazalesin@pbwt.com
jkipnees@pbwt.com

Malcolm Segal (SBN 075481)
SEGAL & ASSOCIATES, PC
500 Capitol Mall, Suite 600

Kenvue's Reply Memorandum of Points and Authorities in Further Support of its Motion to Dismiss the Amended Complaint [Fed. R. Civ. Pro. 12(b)(6)]

Sacramento, CA  95814
Telephone: (916) 441-0886
msegal@segal-pc.com

Kenvue's Reply Memorandum of Points and Authorities in Further Support of its Motion to Dismiss the Amended Complaint [Fed. R. Civ. Pro. 12(b)(6)]